USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 94-1810 SUSAN R. BYRD, Plaintiff, Appellant, v. JOHN T. RONAYNE, ET AL., Defendants, Appellees.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________  ____________________ Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________  ____________________ Norman Jackman, with whom Martha M. Wishart and Jackman & Roth ______________ __________________ _______________ were on brief for appellant. David A. Bunis, with whom Dwyer & Collora was on brief for _______________ ________________ appellees.  ____________________ August 9, 1995  ____________________ CYR, Circuit Judge. Plaintiff Susan R. Byrd, a former CYR, Circuit Judge. _____________ associate in the defendant law firm of Harrison & Maguire, P.C. ("H & M"), sued H & M and various individual partners and associ- ates for alleged sexual discrimination, unequal pay, and retalia- tory discharge. The district court granted summary judgment for defendants on all claims, and Byrd appealed. As summary judgment was proper, we affirm. I I BACKGROUND1 BACKGROUND __________ Byrd joined H & M as an associate on June 5, 1989, one month after graduation from Boston University Law School with an LL.M. in banking law. Prior to attending Boston University, Byrd had been a vice-president and general counsel for Commercial National Bank, Kansas City, Kansas. Previously, she had been employed for six months as an associate counsel by an Oklahoma City bank; a trial attorney with the Federal Deposit Insurance Corporation for one year; and a self-employed private practitio- ner in Wichita Falls, Texas, for two years following her gradua- tion from Oklahoma City University Law School. Before entering law school, Byrd had earned an M.B.A. from Central State Univer- sity. Prior to joining H & M, Byrd inquired whether the firm had a "set partnership track" for associates. Defendant John  ____________________ 1All evidence in genuine dispute is related in a light favorable to Byrd, the party resisting summary judgment. See ___ Velez-Gomez v. SMA Life Assur. Co., 8 F.3d 873, 874-75 (1st Cir. ___________ ____________________ 1993). 2 Ronayne, president of H & M, advised her that there was no set track to partnership but that Byrd likely would be considered for partnership within two to three years provided she met the performance standards. Another partner, defendant Alex MacDona- ld, told her that she "would be the first female partner in the law firm."  When Byrd began with H & M, she was its highest paid associate, at $62,500 and benefits. During her two-year tenure she was responsible for generating almost $100,000 in fees from several new clients she developed while with the firm. At the outset, her areas of practice with H & M were concentrated principally in commercial loan workouts and federal banking regulation. By the fall of 1989 her responsibilities included all H & M bankruptcy cases as well.2 A major client during this period was Boston Five Cents Savings Bank, FSB ("Boston Five"), which looked to Byrd for both its bankruptcy law and bank regula- tion services.  During the latter part of 1989, John Battaglia, a Boston Five vice-president, advised defendant Matthew Kameron, a member of the H & M management committee, that Byrd had prepared a legal memorandum which did not address the question put to her and that Battaglia's department had "lost confidence" and tended to "work around" Byrd rather than rely on her advice. Kameron  ____________________ 2Although Byrd came to H & M with what she describes as "considerable experience" in bankruptcy law, the record indicates only that during her four years with Commercial National Bank she handled some bankruptcy matters. See infra note 10.  ___ _____ 3 discussed Battaglia's concerns with Byrd, then communicated the complaint to Ronayne. Ronayne and Kameron subsequently spoke with Byrd about her performance and her problematic relationship with Boston Five. Nevertheless, in January 1990 she received a $1,500 bonus and a highly complimentary performance evaluation praising her professional competence, writing skills, and atti- tude.  During early 1990, Susan Monahan, vice-president for asset management at Boston Five, told Ronayne that she and others in her department were dissatisfied with Byrd's work and doubted that she had the bankruptcy law knowledge she claimed. According to Monahan, Byrd frequently gave legal advice "off the cuff" which later proved incorrect. Monahan reported that Byrd had delayed filing judicial pleadings she had been instructed to file, and that on at least one occasion she had represented having filed a motion for relief from stay which had never been filed. Finally, Monahan informed Ronayne that Boston Five did not have confidence in Byrd's advice or work product. Ronayne relayed these complaints to Byrd and encouraged her to improve her relationship with Monahan and Boston Five. Shortly thereaf- ter, Byrd wrote Monahan and suggested a meeting "to resolve any difficulties and improve upon our working relationship."  Monahan again complained to Ronayne in August 1990, stating that she would transfer Boston Five's bankruptcy law work to another firm unless H & M reassigned it to someone other than 4 Byrd.3 At around the same time, Wayne Ferguson, vice-president for lending at Boston Five, complained to Ronayne that Byrd was slow to respond to inquiries and her court cases were taking far too long.4 Byrd nonetheless received a $3,000 bonus in the fall of 1990, notwithstanding "mixed" evaluations from Ronayne and Kameron. Ronayne wrote: "You seem to have gotten a good grip on the bank regulatory work over the past year and to have developed your bankruptcy skills." He continued: "In general, you seem to have done a good job on client relations although there have obviously been some issues with the Boston Five relationship." Ronayne candidly noted as well that supervision of Byrd might entail a "problem" for the firm since her areas of concentration were "not something with which the other lawyers in the firm have more than a general knowledge."5   ____________________ 3The record would permit an inference that Monahan was "demanding" and complained about other H & M attorneys as well, which resulted in a male associate, Clive Martin, being relieved of responsibility for matters involving Monahan's department. See also infra pp. 13-15.  ___ ____ _____ 4Although Byrd contends that these complaints pertained to bankruptcy matters entrusted to other attorneys, she has included no evidentiary support in the appellate record. See Fed. R. App. ___ P. 11(a) (appellant bears burden of including materials essential to her claim); Silva v. Witschen, 19 F.3d 725, 728 n.4, 731 n.9 _____ ________ (1st Cir. 1994); see also Fed. R. Civ. P. 56(e). ___ ____ 5Summarizing, Ronayne noted:  I think you are well motivated and very quick on your feet . . . and have shown a commend- able willingness to accept tasks which are assigned to you. . . . On the weakness side, I have sometimes had the sense that you do not have the backup for answers which are 5 Similarly, the 1990 review from Kameron was mixed. Noting that Byrd had improved her ability to communicate with clients but still needed to be "more sensitive to damage con- trol," Kameron observed: "She has had a difficult time with a major client and although the difficulties may have been unre- solvable, I think more effort could have been made before the situation deteriorated."6  In the fall of 1990, Byrd responded as follows to H & M's standardized self-evaluation form:  Being an attorney for ten years my strengths and weaknesses are pretty much set in con- crete. What they are is what most likely they will remain. Boredom has always been my biggest weakness, causing procrastination,  ____________________ given with apparent certainty. This is obvi- ously an ambiguous area since you certainly want to give the appearance of confidence, especially to clients, but you want to be careful about trying to give an impression of certainty when you are not really sure or can't immediately back up the position. It is acceptable from time to time to admit you don't know something and will have to look it up and it is helpful when someone else (i.e. a regulator or another lawyer) gives you an answer to a question to understand the ratio- nale for the answer. 6Kameron summarized: Hopefully, Susan can put some of the more negative aspects of 1990 behind her and con- centrate on the positive and continue to expand in those areas where she has been successful and to continue to serve those clients who are very happy with her in an expanded capacity. However, I reiterate what I think must change and that is Susan has to be willing to admit that asking questions and researching issues are part of being a good lawyer. 6 etc. My strengths have never been utilized in this firm but include management and busi- ness. In November 1990, John Davis became "of counsel" to H & M after five years' specialization in bankruptcy practice, bringing with him clients from whom the firm generated fees approximating $200,000 in a single year. Davis started at $70,000 and benefits, plus 15% of the fees generated in cases for which he was responsible. He assumed client responsibilities apart from those assigned to Byrd.  On April 2, 1991, defendant Ronayne and Denis Maguire, another H & M attorney, met with representatives of the Campane- lli Companies ("Campanelli"), one of H & M's largest clients, who inquired about supervision in H & M's "bankruptcy department," expressed concerns as to whether Byrd "really knew what she was doing," complained that Campanelli's legal work was not being handled in a timely fashion by Byrd, and that the fees Campanelli was charged for her services were too high. Ronayne and Maguire concluded that there were serious problems with the quality of Byrd's performance for Campanelli and that H & M risked losing Campanelli altogether unless it took immediate action.  Later that day, Ronayne and Maguire met with Byrd and informed her that the firm had decided that the Campanelli account should be reassigned to Davis, with Byrd to continue  at the same salary handling Boston Five's consumer bankruptcy work and regulatory matters, as well as her other clients. Two days later, Byrd filed a Title VII sexual discrimination claim 7 with the Equal Employment Opportunity Commission ("EEOC") and so informed H & M, which promptly retained outside counsel.  In late April 1991, Katherine Hinderhoffer, executive vice-president for Boston Five, contacted Ronayne. She stated that Byrd did not have sufficient knowledge of the law and that Boston Five lacked confidence in Byrd's legal advice and work product. Finally, in early May 1991, Wayne Ferguson once again contacted the firm to complain that Byrd was not submitting timely and accurate status reports and that her cases continued to proceed too slowly.  At their June 1991 meeting, the H & M partners deter- mined that Byrd's professional judgment and client-communications skills were not in keeping with the firm's professional stan- dards. After consulting with outside counsel, the partners unanimously voted to terminate Byrd's employment. Defendant Ronayne so informed Byrd on July 11, 1991.  Byrd brought suit against defendants-appellees in Massachusetts Superior Court, asserting various claims under state law, Title VII sexual discrimination and retaliation claims under 42 U.S.C. 2000e et seq., and an Equal Pay Act claim __ ___ under 29 U.S.C. 206(d)(1). Following removal, the federal district court granted summary judgment for all defendants on all federal claims, and dismissed the state-law claims pursuant to 28 U.S.C. 1367(c)(3). Byrd appealed. II II DISCUSSION DISCUSSION __________ 8 We examine the grant of summary judgment de novo, __ ____ viewing all competent evidence in genuine dispute, and reasonable infer-ences therefrom, in a light more favorable to Byrd. See ___ O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir.), cert. denied, ________ _______ _____ ______ 114 S. Ct. 634 (1993). Summary judgment is inappropriate unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Henley Drilling Co. v. McGee, 36 F.3d 143, ___________________ _____ 144 (1st Cir. 1994). Nevertheless, even in discrimination cases "summary judgment may be appropriate" where the party resisting judgment relies "upon conclusory allegations, improbable infer- ences, and unsupported speculation" as to any essential element in her claim. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 ___ ____________ _________________________ F.2d 5, 8 (1st Cir. 1990). A. Employment Discrimination Claim  A. Employment Discrimination Claim _______________________________ 1. The McDonnell Douglas Framework 1. The McDonnell Douglas Framework _______________________________ The three-stage, burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973) ________________________ _____ ["McDonnell Douglas"], serves to allocate burdens of production _________________ and order the presentation of evidence in Title VII disparate treatment cases, thus "progressively . . . sharpen[ing] the inquiry into the elusive factual question of intentional discrim- ination." Texas Dep't of Community Affairs v. Burdine, 450 U.S. _________________________________ _______ 248, 255 n.8 (1981). See St. Mary's Honor Ctr. v. Hicks, 113 S. ___ _____________________ _____ 9 Ct. 2742, 2746 (1993). At the first stage, Byrd was required to make a prima facie showing that (1) she "was within a protected class," (2) possessed the necessary qualifications for, "and adequately performed, her job," (3) but "was nevertheless dismissed," and (4) her "employer sought someone of roughly equivalent qualifi- cations to perform substantially the same work." Cumpiano v. ________ Banco Santander Puerto Rico, 902 F.2d 148, 153 (1st Cir. 1990). ____________________________ A prima facie case gives rise to a rebuttable presumption that the employer unlawfully discriminated against the Title VII plaintiff. Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 (1st _____ ______________________ Cir. 1994), cert. denied, 115 S. Ct. 1958 (1995). _____ ______ At the second stage, the employer must produce suffi- cient competent evidence, "taken as true," to permit a rational _____ __ ____ ______ factfinder to conclude that there was a "nondiscriminatory reason" for the challenged employment action, thereby displacing the presumption of intentional discrimination generated by the prima facie case. Woodman v. Haemonetics Corp., 51 F.3d 1087, _______ _________________ 1091 (1st Cir. 1995) (citing Hicks, 113 S. Ct. at 2748).  _____ At the third and final stage in the McDonnell Douglas _________________ analysis, the Title VII plaintiff, "with whom the ultimate burden of persuasion remains throughout," must proffer "sufficient __________ admissible evidence, if believed, to prove by a preponderance of the evidence each essential element in a prima facie case and _____ _____ that the employer's justification for the challenged employment action was merely a pretext for impermissible . . . discrimina- 10 tion." Id. at 1092. "Where the elements of a sufficient prima ___ facie case combine with the factfinder's belief that the ostensi- ble basis for dismissing the employee was pretextual, `particu- larly if . . . accompanied by a suspicion of mendacity,' the factfinder is permitted to infer the intentional . . . discrimi- _________ nation required to enable the plaintiff-employee to prevail on the merits." Id. (quoting Hicks, 113 S. Ct. at 2749).  ___ _____ a) Prima Facie Case a) Prima Facie Case ________________ Although "the required prima facie showing is not especially onerous," id. at 1091, the district court ruled that ___ Byrd had not established the second essential element that she possessed the requisite qualifications for, and adequately performed, the legal services assigned to her by H & M. We believe it advisable, nonetheless, to assume that Byrd managed her prima facie case, see, e.g., LeBlanc v. Great Am. Ins. Co., 6 ___ ____ _______ __________________ F.3d 836, 843-44 (1st Cir. 1993), cert. denied, 114 S. Ct. 1398 _____ ______ (1994), and to proceed further into the burden-shifting analysis where the shortcomings in her claim are more clear.  b) Defendants' Burden of Production b) Defendants' Burden of Production ________________________________ As nondiscriminatory grounds for their challenged actions, defendants proffered competent evidence of continuing client complaints relating to the timeliness, quality, and reliability of Byrd's legal services. Whether "ultimately persuasive or not," Hicks, 113 S. Ct. at 2748, their proffers _____ rebutted any presumption of unlawful sexual discrimination in employment generated by the prima facie showing attempted by 11 Byrd, see Woodman, 51 F.3d at 1092, and it became incumbent upon ___ _______ her to produce competent evidence that the nondiscriminatory reasons proffered by defendants were a mere pretext for unlawful discrimination. Id.  ___ Byrd has never denied that two large H & M clients lodged serious complaints concerning her professional competence and performance. Indeed, the self-evaluation form submitted by Byrd conceded not only that boredom was her "biggest weakness," and that it caused her to "procrastinat[e]," but that her profes- sional weaknesses were "pretty much set in concrete[]" and "most likely . . . will remain." These admissions are buttressed by the uncontroverted evidence that H & M, despite its numerous appeals to Byrd, continued to receive similar complaints from clients relating to the untimeliness and unsatisfactory quality of her legal services. Moreover, the record is unequivocal that despite its numerous unsuccessful attempts to encourage Byrd to be more responsive to these client concerns, H & M refrained from any adverse employment action until Campanelli's complaints ___ raised serious concerns that the firm would lose one of its largest clients unless Byrd were replaced. Even then, H & M did not terminate Byrd. It was not until the complaints from Boston Five resumed several weeks later that the firm decided to dis- _______ charge her for failing to meet its professional standards.7   ____________________ 7There is no evidentiary basis for inferring that H & M's professional standards were met by Byrd, nor that any other associate remained with the firm notwithstanding such deficien- cies in performance. And though it is undisputed that no female associate had ever been considered for partnership at H & M 12 Byrd relies on the favorable performance evaluation she received from the firm in January 1990, approximately fifteen months before her client responsibilities were realigned, and on the mixed performance evaluations received from Ronayne and Kameron in late 1990, as evidence that the principal defendants were "happy with her work and her ability to generate business." She points as well to the undisputed evidence that she was rewarded with two bonuses in 1990.  We think these proffers fall well short of generating a trialworthy dispute as to whether the nondiscriminatory reasons articulated by H & M constituted a pretext for intentional sex- based discrimination in employment. For one thing, the January 1990 evaluation was the only altogether favorable one Byrd ____ received. More importantly, however, the "mixed" evaluations she received in late 1990 presaged the declining trajectory her professional performance thereafter reflected as reported by __ ________ __  ____________________ before Byrd's termination, Byrd has not shown that any other ___ _____ associate male or female who failed to conform with the _________ ____ __ ______ firm's professional standards, had ever been considered for partnership. See Stratus, 40 F.3d at 17 ("[F]or us to compare ___ _______ [female plaintiff's] treatment with that of . . . male executives in a meaningful way, [plaintiff] would have to show that she was similarly situated to those men in terms of performance, qualifi- cations and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations.") (cita- tion omitted); cf. LeBlanc, 6 F.3d at 348 (statistical data on __ _______ general hiring patterns, though relevant, carry less probative weight in disparate treatment cases than in disparate impact cases: "[A] company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individu- al.").  13 clients and projected in Byrd's self-evaluation.8 _______ ___ _________ __ ______ _______________ Byrd further notes that Monahan complained about another H & M attorney, Clive Martin, who was not terminated. ___ The record likewise makes clear, though, that Byrd's termination ______ was not based on Monahan's complaints but on subsequent com- ___ plaints from Campanelli and renewed complaints from Boston Five representatives other than Monahan. In fact, throughout her _____ ____ _______ __________ ___ tenure with H & M, Byrd continued to perform bank regulation and ______ consumer bankruptcy services for Boston Five. It was not until Boston Five executive vice-president Katherine Hinderhoffer complained for the first time, and Wayne Ferguson again com- plained following the Campanelli complaint that Byrd was terminated. A disparate treatment claimant bears the burden of proving that she was subjected to different treatment than persons similarly situated "`in all relevant aspects.'" Stratus, _________ ________ __ ___ ________ _______ _______ 40 F.3d at 17 (quoting Dartmouth Review v. Dartmouth College, 889 ________________ _________________ F.2d 13, 19 (1st Cir. 1989)) (alteration in original). Accord- ingly, Byrd would have had to demonstrate that she and Martin were similarly situated "in terms of performance, qualifications and conduct, `without such differentiating or mitigating circum- stances that would distinguish' their situations." Id. at 17 ___  ____________________ 8Although Byrd proffered undisputed evidence that her efforts in a complex commercial loan workout had won high praise from Michelle Dowd, head of Boston Five's loan review department, and that Dowd was especially impressed with Byrd's background in commercial lending, the Dowd affidavit in no sense gainsays the numerous complaints relating to Byrd's other professional legal _____ services. 14 (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. ________ ____________ 1992)). She proffered no such evidence.  Although there is competent evidence that Susan Monahan complained against Clive Martin as well, yet he was not terminat- ed, the only record evidence relating to Martin, even conceding ____ its competence, is a statement in Byrd's affidavit that based on her "conversations . . . with Martin, Susan Monahan had [Martin] removed from her cases." There is no evidence relating to Martin's responsibilities in behalf of Boston Five, his professional experience and expertise, his seniority with H & M, nor even the nature and number of complaints against him. Nor is there evidence that Martin had been the subject of repeated ________ complaints by Monahan or continuous complaints from other Boston _____ Five executives, and from another major H & M client. Finally, there is no evidence that Martin was retained by the firm despite repeated lapses in professional performance after numerous appeals to improve his performance.  In sum, there is no competent evidence from which a rational factfinder reasonably could infer that H & M's explana- tion for its adverse employment action was a pretext for unlawful employment discrimination. See id. at 16. ___ ___ B. Retaliation Claim B. Retaliation Claim _________________ Byrd asserts that the summary judgment order dismissing her retaliatory discharge claim must be vacated because a ratio- nal factfinder reasonably could conclude that she had been discharged for filing a discrimination claim with the EEOC. See ___ 15 Greenberg v. Union Camp Corp., 48 F.3d 22, 29 (1st Cir. 1995) _________ _________________ (plaintiff must show that articulated reason for employer's action was a pretext for retaliation); Mesnick v. General Elec. _______ _____________ Co., 950 F.2d 816, 827 (1st Cir. 1991), cert. denied, 504 U.S. ___ _____ ______ 985 (1992). For the most part, her retaliatory discharge claim rests on the identical inferences of pretext found wanting above. See supra pp. 13-15. ___ _____ The only other evidentiary support for her retaliation claim is a passage in the Ronayne deposition, which she charac- terizes as "an admission that [her] filing of the discrimination claim was a factor in her discharge." She adverts to a portion: "I don't think the filing of a discrimination charge with the EEOC significantly affected [Byrd]." But she disregards language which provides critically important context. The full text reflects that Ronayne stated: "The same thing would have hap- ___ ____ _____ _____ ____ ____ pened if [Byrd] hadn't filed a complaint. I'm not saying that _____ __ ______ _____ _ _________ people weren't annoyed by [her EEOC complaint], but I don't think it significantly affected her." (emphasis added). Given Ronayne- 's flat denial in the opening sentence, his statement cannot reasonably be considered an admission that the firm harbored a retaliatory motive for Byrd's termination. Thus, summary judg- ment on the retaliation claim was proper as well.  C. Equal Pay Act Claim C. Equal Pay Act Claim ___________________ The Equal Pay Act prohibits wage discrimination "be- tween employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and 16 responsibility, and which are performed under similar working conditions." 29 U.S.C. 206(d)(1). An Equal Pay Act plaintiff must make a prima facie showing that the employer paid different wages to an employee of the opposite sex for substantially equal work. See Corning Glass Works v. Brennan, 417 U.S. 188, 195 ___ ____________________ _______ (1974); see also Marcoux v. Maine, 797 F.2d 1100, 1106 (1st Cir. ___ ____ _______ _____ 1986). At that point, the defendant-employer must establish one of the following affirmative defenses: the wage discrepancy resulted from (i) a seniority system, (ii) a merit system, (iii) a system measuring earnings by quantity or quality of production, or (iv) a differential based on a factor other than sex. 29 __ U.S.C. 206(d)(1); Corning Glass Works, 417 U.S. at 196. ___________________ Byrd claims that H & M violated the Equal Pay Act, in that her starting salary was $62,500, augmented only by two modest bonuses, compared with John Davis's $70,000 salary and 15% of generated fees, even though her senior associate position was substantially equivalent to the "of counsel" position held by Davis. Byrd attempts to make her prima facie case by comparing Davis's professional experience with her own.9 She asserts that Davis had less bankruptcy law experience when he came to H & M  ____ five years', by her calculation than her six years'. The only  ____________________ 9For present purposes, we simply assume arguendo that ________ competent evidence of comparable bankruptcy law experience might provide indirect support for Byrd's claim that the two positions ________ _________ required substantially equal skills. We note, nonetheless, the agency position that skill "must be measured in terms of the performance requirements of the job. . . ." Possession of a skill not needed to meet requirements of the job cannot be considered in making a determination regarding equality of skill." 29 C.F.R. 1620.15(a). 17 competent record evidence, however, is the affidavit of a former executive vice-president of Commercial National Bank, who merely states that one of the responsibilities assigned to Byrd during ___ her two-year tenure was to "handle[]" "many" chapter 12 (family- farm debtor) matters doubtless not a relevant qualification at H & M and "some" chapter 11 and chapter 7 cases.10  For additional support, Byrd points to the Ronayne deposition, which she characterizes as an admission that she and Davis performed "parallel functions" at H & M. On the contrary, the Ronayne deposition evinces no more than that Davis did not supervise Byrd, an undisputed fact which plainly affords insuffi- _________ cient support for a reasonable inference that the two held positions requiring substantially equal skill, effort, and responsibility. See Soble v. University of Md., 778 F.2d 164, ___ _____ _________________ 167 (4th Cir. 1985) (finding no actionable wage discrimination where female professor was paid less than male professors of same academic rank who performed work requiring greater skill, effort, or responsibility). Thus, the lack of evidence that their respective professional responsibilities with H & M required substantially equal skill, effort and responsibility, foredoomed Byrd's Equal Pay Act claim.  Finally, on a more conclusive note, the record includes  ____________________ 10Byrd simply concludes that she "had a great deal of bankruptcy experience" at the time Davis came to H & M. More- over, though surely in a position to provide greater detail, she has provided no evidentiary support for the claim that she had as __ much bankruptcy law experience when she joined H & M, as Davis ____ had when he came to the firm.  18 undisputed evidence that Davis came to H & M with clients whose aggregate annual billings approached $200,000. These clients paid H & M $180,000 in fees during 1990. On the other hand, Byrd brought no clients with her when she joined H & M. The clients for whom she rendered legal services while with H & M paid the firm no more than $100,000 during her entire two-year tenure. Thus, the substantially greater revenues Davis generated for the firm afforded defendants an affirmative defense, under 29 U.S.C. 206(d)(1)(iv) (differences in compensation based on a factor other than sex), to Byrd's prima facie wage discrimination claim. See Stanley v. University of S. Cal., 13 F.3d 1313, 1322-23 (9th ___ _______ _____________________ Cir. 1994) (gender-neutral differences between responsibilities incumbent upon coaches of men's and women's basketball teams included the more substantial public relations and promotional duties of men's coach, whose team generated revenue 90 times greater than women's team). III III CONCLUSION CONCLUSION __________ As defendants were entitled to summary judgment as a matter of law on all claims, the district court judgment is affirmed. ________ 19