Margarita SERAPION, Plaintiff,

v.

Fred H. MARTINEZ, et al., Defendants.

Civil No. 93–1790(SEC).

United States District Court,
D. Puerto Rico.

Sept. 24, 1996.

Judith Berkan, Río Piedras, PR and Rosalinda Pesquera, Elias, Dávila & Baez, Hato Rey, PR, for Plaintiff.

Alvaro R. Calderón, Jr., Hato Rey, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is defendants' "Second Motion for Summary Judgment" (**Docket #48**). Plaintiff, Margarita Serapión, has filed a Title VII complaint against Fred H. Martínez, Lawrence Odell and José Luis Calabria—partners at the law firm of Martínez, Odell & Calabria ("MOC")—in which she alleges that, while a partner at the firm,[1] she was denied the right to achieve full partnership on account of her gender.[2] She further contends that she has a state law claim under Act 100, 29 L.P.R.A. § 146, and requests that the Court assume pendent jurisdiction as to that claim.

Defendants first filed a motion for summary judgment on July 13, 1993. Essentially, they argued that, since plaintiff was a partner at the firm, she was not an "employee" for purposes of Title VII of the Civil Rights Act, 41 U.S.C. § 2000(e). Chief

---

1. The firm was then known as Martínez, Odell, Calabria & Sierra ("MOCS").

2. Also sued were the partners' wives and the firm of MOC.

Judge Cerezo, who was presiding over the case at the time, denied the motion on the ground that there were genuine issues of material fact and questions of credibility which were not suitable for summary judgment. A year and a half later, having completed discovery and further examined all pertinent evidence, defendants filed a second motion for summary judgment based, *inter alia*, on the following grounds: (1) that plaintiff was exempted from coverage as an employee under Title VII because she was a proprietary partner at MOCS and a member of its Executive Committee and Board of Partners; (2) that plaintiff could not establish a *prima facie* case of discrimination under Title VII; (3) that neither the individual defendants, Fred Martínez, Lawrence Odell, José Luis Calabria, nor their respective spouses could be held liable under Title VII inasmuch as they could not be deemed plaintiff's employers; and (4) that this Court should decline to exercise supplemental jurisdiction.

Defendants submitted a Rule 311.12 Statement of Uncontested Facts and forty-six exhibits in support of the motion, which was duly opposed. On April 16, 1996, defendants further submitted a comparison and analysis of plaintiff's Response to Defendants' Rule 311.12 Statement of Uncontested Facts. Having reviewed all the motions, memoranda and exhibits submitted by the parties, the Court **GRANTS** defendants' second motion for summary judgment (**Docket # 48**) for the reasons stated below.

## THE FACTS

On or about September of 1979, co-defendants Martínez, Odell and Calabria joined Antonio J. Colorado and Ralph Sierra to establish a partnership for the practice of law, under the name of Colorado, Martínez, Odell, Calabria & Sierra ("CMOCS"). Shortly thereafter, Colorado extended plaintiff, a recent graduate from the University of Puerto Rico Law School, an offer to join the firm as an associate. Nevertheless, in August of 1983, plaintiff resigned from her employment as an associate with CMOCS to join the Puerto Rico Treasury Department as Assistant Secretary for Internal Revenue and Collections, a position which she held until March of 1985. Docket # 61, Plaintiff's Rule 311 Statement of Uncontested Facts, Exhibit 1, at 2. Upon completion of her tenure, plaintiff accepted Odell's offer to rejoin the firm as a senior associate in the firm's Tax Department.[3] Docket # 61, Exhibit 1, at 2. Her initial compensation package included benefits such as paid life insurance, pension plan accruals, payment for half the cost of the medical plan, a $2,000.00 expense allocation for seminars, and participation in the annual law firm outing. Plaintiff became the first associate ever to receive a car allowance. Her compensation was also higher than that received by any other male or female associate, except for then senior associate Graciela Belaval, who had ten years of experience as a litigation attorney. Docket # 48, Defendants' Rule 311.12 Statement of Uncontested Facts, at 1-3.

A year and a half after she was rehired as an associate, plaintiff was promoted to junior partner, as a result of which her compensation package increased further. Unlike her predecessors, plaintiff was not required to invest in the law firm in order to become a junior partner. Docket # 48, Statement of Uncontested Facts, at 4-5. In May of 1989, while still a junior partner, plaintiff married a fellow attorney at the firm's Tax Department, Mr. John Belk. She did not disclose this fact to the senior partners, or to anyone else at the firm. Docket # 61, at 14.

Shortly thereafter, on January of 1990, plaintiff became the only person ever to be promoted to proprietary partner from within the firm. Once again, she was spared the requirement of having to contribute to the firm's capital. The other partners each ceded her one percent (1%) of their equity participation in the firm, for a total equity participation of 4%. Docket # 61, Exhibit 1, at 4. Upon her promotion, plaintiff became entitled to the fifth vote in the firm's Executive Committee and actively participated in most of the Committee's regular meetings. Docket # 48, Statement of Uncontested Facts, at 5-7.

---

**3.** By that time, Colorado had left the firm to work in the Government, and the firm had reorganized under the name of Martínez, Odell, Calabria & Sierra.

Plaintiff's phase-in period toward full participation in the firm's profits was discussed at an Executive Committee meeting held on December 8, 1990. It was finally decided that "Ms. Serapión's parity with all other Proprietary Partners would be phased in during a period of three years from her admission as Proprietary Partner," and that "[a]t the end of the three year period she would be at parity with respect to compensation, distributions, units, and any other form of compensation to which the four other Proprietary Partners are entitled." Docket # 48, Exhibit 6, at 58.

Plaintiff's salary upon becoming proprietary partner was raised to $60,183.00, with an expense allocation of $16,400.00, a car allowance of $10,800.00 a year, and bonuses in the amount of $42,050.00 during the first year of partnership. Her compensation package was fixed at seventy-five percent (75%) of that of the four senior proprietary partners. Docket # 61, Exhibit 1, at 4. Thereafter, she received wage increases which placed her total compensation at the dissolution of the firm in 1992 at ninety-two percent (92%) of the compensation of the remaining senior proprietary partners. Docket # 48, Statement of Uncontested Facts, at 9.

The partnership agreement under which MOCS operated from its inception required a vote of four out of five of the proprietary partners for any decision affecting the firm. That gave plaintiff twenty percent (20%) of the voting power, a power which, according to the documentary evidence submitted by defendants, she exercised in matters like (1) the election of junior partners;[4] (2) performance evaluations; (3) work assignments; (4) the recruitment of additional counsel; (5) setting the firm's policy; (6) the engagement of experts; (7) profit distribution; (8) the promotion of associates; (9) the execution of amended partnership contracts; (10) the disciplining of employees; (11) the exercise of control over the firm's finances; (12) the approval of benefits to junior partners; (13) serving as signatory to the firm's bank accounts; (14) determining litigation strategies;

(15) increasing the professional fees charged by the firm; (16) quality control; and (17) negotiations as to office space and relocation. Docket # 48, Statement of Uncontested Facts, at 13–26.

As early as 1984, plaintiff's fellow tax partner and head of the Tax Department, Ralph Sierra, began experiencing serious professional differences with senior partners Martínez, Odell and Calabria. On two occasions, Sierra suggested that Martínez cease to appear as the first-named partner. Docket # 48, Exhibit 11. In an internal memorandum dated January 17, 1989, Sierra stated that he would no longer accept responsibility for any engagements as to which Martínez had overall client responsibility. Docket # 48, Exhibit 29. He also expressed his intention to "openly seek alternative professional opportunities outside the Firm". *Id.* During the month of May, 1989, Sierra stopped going to the office altogether, and communicated with the firm only by telephone or fax. Docket # 48, Statement of Uncontested Facts, at 28–29. Finally, in a memo he wrote on January 14, 1992, he included Calabria's retirement as an issue to be discussed in their executive committee meeting, although Calabria was not interested in retirement at that point. *Id.* at 32.

Calabria reacted to the ongoing controversy with a memorandum to all proprietary partners, in which he asked them to try to avoid the "nightmarish ordeal of dissolving a firm the size of ours." Docket # 48, Exhibit 30. As a possible solution to these internecine disputes, Martínez subsequently suggested the possibility of recruiting a Senior Tax Partner that did not respond to Mr. Sierra. Docket # 48, Statement of Uncontested Facts, at 31.

Plaintiff backed Sierra on all of the preceding partnership disputes, a fact which often led to an impasse in the Executive Committee's decision-making processes. For instance, on March 20, 1992, Odell addressed a memorandum to all partners, in which he expressed his desire to restructure the firm.

---

**4.** Plaintiff's exercise of this particular right included her participation in the promotion of her husband, John Belk, to the position of Junior Partner. See Minutes of Extraordinary Meeting of Board of Partners, Docket 48, Exhibit 15, at 1.

Plaintiff coalesced with Sierra in order to defeat this motion. *Id.* at 31.

Given the stalemate which the forgoing polarization of MOCS into two factions provoked, Sierra suggested that the firm retain the services of a management consulting firm to review its problems. The other proprietary partners agreed, and Hildebrandt, Inc. was retained to conduct an evaluation of the problems affecting the firm, and to make recommendations thereafter. *Id.* at 32. Based on the research which they performed, the consultants concluded that the firm's most pressing problem was one of control, not compensation. *Id.* at 33. They based their conclusion on interviews where, for example, Sierra admitted that his main problem had to do with Martínez's quest for power; and plaintiff admitted that Martínez wanted power and control, and wished to get rid of Sierra. The consultants further noted that the two factions which developed among the proprietary partners, namely, plaintiff and Sierra on one side, and Martínez, Odell and Calabria on the other, together with the four-out-of-five majority voting rule, made it very difficult to make any significant decisions in the firm. Therefore, they recommended that this rule be dispensed with. *Id.* at 33–34.

On April 29, 1992 Sierra and plaintiff received a written ultimatum from the remaining partners, asking them to accept certain proposed changes to the partnership agreement or face the dissolution of the firm. Docket # 48, Exhibit 36. Sierra and Serapión responded to the resolution by demanding the arbitration of the dispute pursuant to the terms of the contract. Docket # 48, Exhibit 37. Martínez, Odell and Calabria took the request for arbitration as a rejection of their formal proposal and decided to end their partnership with Sierra and plaintiff and establish a new partnership among the three of them, which they did on May 1, 1992.[5] Docket # 48, Statement of Uncontested Facts, at 40. The remaining tax partners, plaintiff's husband, John Belk, and Magaly Cobián, were also excluded from the new partnership. *Id.* On May 7, 1992, plaintiff and Sierra responded by forming a new partnership with the other tax partners, under the name of Sierra & Serapión. *Id.* at 41.

## Summary Judgment Standard

As noted by the First Circuit,

[s]ummary judgment has a special niche in civil litigation. Its role is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* [507 U.S. 1030] 113 S.Ct. 1845 [123 L.Ed.2d 470] (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources.

*McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

According to Fed.R.Civ.P. 56(c), a summary judgment motion should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See also *NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28 (1st Cir.1994). It is not enough to conjure up an alleged factual dispute between the parties; to defeat summary judgment, there must exist a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

For a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party. *U.S. v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir. 1992). See also, *Boston Athletic Assn. v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989). By like token, "material" means that the fact is one that might affect the outcome of the suit

---

**5.** Thus, the firm was, again, reorganized to become Martínez, Odell & Calabria, as the firm is currently known.

under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994).

Recent case law has also established that "summary judgment may be appropriate '[e]ven in cases where elusive concepts such as motive or intent are at issue ... if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation'." *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994) (quoting *Medina–Muñoz v. R.J. Reynolds Tobacco, Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

In determining whether to grant summary judgment, the Court may not, however, weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." Id. (citing *Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines*, 42 F.3d at 684.

**APPLICABLE LAW/ANALYSIS**

**I. Effect of plaintiff's status as partner under Title VII**

It has long been undisputed that "[w]hile employees of a partnership are protected under Title VII, the partners themselves are not." 4 Cook & Sobieski, Jr. *Civil Rights Actions* ¶ 21.08[E] (1994). In *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), for example, the Supreme Court upheld a female associate's Title VII cause of action against her firm's partners for their failure to name her partner, as promised when she became an associate. Finding that under the particular facts of the case, consideration for partnership was a term and condition of her employment as an associate, the Court held that Title VII protected the associate's contractual right to be considered for a partnership. *Id.* at 76, 104 S.Ct. at 2234. In a concurring opinion, however, Justice Powell noted that:

the Court's opinion should not be read as extending Title VII to the management of a law firm by its partners. The reasoning of the Court's opinion does not require that the relationship among partners be characterized as an 'employment' relationship to which Title VII would apply. The relationship among law partners differs markedly from that between employer and employee—including that between the partnership and its associates.

*Id.* at 79, 104 S.Ct. at 2236. Federal courts have extensively cited Justice Powell's concurring opinion in *Hishon* to sustain the holding that "the benefits of antidiscrimination statutes ... do not extend to those who properly are classified as partners." *Hyland v. New Haven Radiology Associates*, 794 F.2d 793, 797 (2nd Cir.1986).

After *Hishon*, the Equal Employment Opportunity Commission exercised its mandate to interpret and enforce Title VII and issued a decision finding that partners in a law firm could not be classified as employees for purposes of Title VII. *See* EEOC decision No. 85–4, Emp.Prac.Guide (CCH) para. 6840, at 7040 (Mar. 18, 1985). More importantly, the EEOC established that "[i]n determining whether the individual is a partner or an employee in a particular case, the Commission will consider several factors including, but not limited to, the individual's ability to control and operate the business and to determine compensation and the administration of profits and losses." *Id.* at 7041 n. 4.

Those federal courts which have had the opportunity to address the applicability of Title VII to partnerships in general have similarly concluded that while employees of a partnership are protected by Title VII, the partners themselves are not. See, e.g. *Burke v. Friedman*, 556 F.2d 867 (7th Cir.1977); *Wheeler v. Hurdman*, 825 F.2d 257 (10th Cir.1987); and *Fountain v. Metcalf, Zima & Co., PA.*, 925 F.2d 1398 (11th Cir.1991) (within the scope of ADEA). It is evident from these, as well as other opinions, that the factors for determining one's status as a partner under Title VII remain the same regardless of the type of business or partnership involved.

In *Burke,* for example, the Seventh Circuit held that when a partner participates in the administration and control of the business and shares in the profits and losses, he or she cannot be regarded as an employee, but rather as an employer who owns and manages the operation of the business. 556 F.2d at 869. Similarly, in *Wheeler,* plaintiff's status changed from that of employee to partner. After considering plaintiff's powers and duties, the court held that Ms. Wheeler was not an employee under the definition of Title VII and was thus not entitled to coverage under the Act. When assessing Ms. Wheeler's status as an employer, the court stated as follows:

> Wheeler's circumstances as partner are portrayed as undistinguishable from her prior employee status. Yet, they are distinguishable and substantially so. Her participation in profits and losses, exposure to liability, investment in the firm, partial ownership of firm assets, and her voting rights—plus her position under the partnership agreement . and partnership laws—clearly place her in a different economic and legal category. Evidence of that conclusion is found in the fact that only a small percentage of Main Hurdman personnel were admitted to the partnership.

825 F.2d at 267. Finally, in *Fountain v. Metcalf,* the plaintiff, a partner at defendants' accounting firm, filed an age discrimination claim under ADEA against his former partners. In holding that the plaintiff was an employer, the Court explained that:

> [i]t is undisputed that, unlike the firm's employees, Fountain: shared in the firm's profits, losses, and expenses; was compensated on the basis of a share in the firm's profits; was liable for certain debts, obligations, and liabilities of the firm; and had a right to vote his thirty-one percent ownership on member/shareholders' amendments to the agreement, on admission of new member/shareholders, on termination of relationship with member/shareholders, on draws, and on distribution of profits and income. Those facts are virtually a textbook listing of the management, control

and ownership factors that establish Fountain's role as that of partner, not employee. *Fountain,* supra, at 1401.

The uncontested facts in the instant case seem strikingly similar to those in the forgoing cases. Plaintiff's ascent to full partnership did involve significant changes in her status at the firm: (1) she participated in the administration and control of the firm; (2) she had a share—albeit a small one—in the firm's profits and losses; (3) despite the fact that she made no equity contribution to the firm, her compensation at the time the partnership was dissolved was 92% of that of the senior partners; and (4) her voting rights were undisputed—in fact, it was precisely her voting power as proprietary partner which rendered the other partners unable to make any significant changes in the partnership agreement and forced them to resort to a management consulting firm to address their problems.

The functions, powers and characteristics of her position were therefore, those which are typically exercised by partners. See *Burke,* 556 F.2d at 869; *Wheeler,* 825 F.2d at 267; *Fountain,* 925 F.2d at 1401. As such, she cannot be considered an "employee" under the provisions of the statute.

## II. Existence of a prima facie case of discrimination under Title VII

Assuming, *arguendo,* that her partnership status could not be established from the undisputed facts and documentary evidence which the parties submitted, plaintiff's Title VII action would still not withstand a close analysis on the merits.

It is well settled that, in disparate treatment actions, a Title VII plaintiff bears the ultimate burden of proving that she was a the victim of intentional discrimination. *Udo v. Tomes,* 54 F.3d 9, 12 (1st Cir.1995); *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995); *St. Mary's Honor Center. v. Hicks,* 509 U.S. 502, 506–10, 113 S.Ct. 2742, 2747–8, 125 L.Ed.2d 407 (1993). Title VII "does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision."

*Udo v. Tomes,* 54 F.3d at 13, quoting *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 16 (1st Cir.1994).

In order to prove that she was a victim of intentional discrimination, "[a] disparate treatment claimant bears the burden of proving that she was subjected to different treatment than persons similarly situated 'in all relevant aspects'...., [i.e.], in terms of performance, qualifications and conduct." *Byrd v. Ronayne,* 61 F.3d 1026 (1st Cir.1995). Should the claimant be unable to offer direct proof of a discriminatory animus, the burden of producing evidence will be allocated "according to the now-familiar three step framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805 [93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668] (1973)." *Udo,* 54 F.3d at 12. See also *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86 (1st Cir.1996); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In other words, the claimant will first have to:

> make a prima facie showing of discrimination, established by proving: (I) that plaintiff is a member of a protected class; (ii) that plaintiff performed his or her job satisfactorily; (iii) that plaintiff was discharged; and (iv) that plaintiff's position remained open and was eventually filled by persons with plaintiff's qualifications. A plaintiff's successful production of a prima facie case creates a presumption of discrimination.

*Ayala–Gerena,* 95 F.3d at 95 (citations omitted).

Once the plaintiff demonstrates the forgoing, the burden shifts to the defendants, who must produce sufficient evidence to rebut plaintiff's prima facie case. *St. Mary's Honor Center. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the defendants satisfy this requirement, the burden once again rests upon the plaintiff, who must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason for terminating the plaintiff is a pretext, and (2) that the true reason for such dismissal was intentional discrimination. *Udo,* 54 F.3d at 13; *Smith,* 40 F.3d at 16. Plaintiff must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: [gender] discrimination." *Mesnick v. General Electric Co.,* 950 F.2d 816, 823 (1st Cir. 1991).

Plaintiff has failed to present direct evidence of her alleged gender discrimination. She has, in fact, consistently acknowledged that, upon joining MOCS, she received favorable treatment from the firm's partners. She admitted, for example, (1) that she was the first and only attorney to be offered a proprietary partnership under which she would eventually—within three years—achieve full parity with all the other proprietary partners; (2) that she was dispensed from making the capital contribution required in the partnership agreement; and (3) that she was afforded such benefits even though she had not brought any clients to the firm. As the First Circuit recently affirmed, "[w]hile perhaps probative of discrimination, stray remarks do not satisfy a plaintiff's burden of proving discrimination by direct evidence." *Ayala–Gerena,* 95 F.3d at 96 (citations omitted). The *McDonnell Douglas* burden shifting framework must, therefore, come into play.

Although plaintiff obviously engaged in protected conduct and may have suffered an adverse employment action, she has failed to demonstrate a causal connection between these two facts. Again, such stray remarks as plaintiff quite ably introduced in order to render this claim more colorable "lack the necessary link between the alleged speaker's discriminatory remark and the adverse employment decision." *Ayala–Gerena,* 95 F.3d at 96. It is, in fact, undisputed that upon the dissolution of MOCS, none of the Tax Department attorneys—men or women—were extended offers to join the new law firm, except for a female associate, Brunilda Rodríguez. There is therefore, no evidence that defendants retained or treated similarly situated persons who are not within her protected class more favorably. *Byrd,* 61 F.3d at 1032–34; *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836; 842 (1st Cir.1993); *Connell v. Bank of Boston,* 924 F.2d 1169, 1172 (1st

Cir.1991); *Medina Muñoz v. R.J. Reynolds Tobacco, Co.*, 896 F.2d 5, 8–9 (1st Cir.1990).

Plaintiff argues that defendants never intended that she achieve full partnership, and extended her partnership status so as to retain her in the firm due to her high productivity. She supports the forgoing with a sworn statement from her former and current partner, Ralph Sierra, stating that the proposed partnership agreement which defendants submitted would have (I) lowered plaintiff's compensation; (ii) prevented her from achieving full parity with the other partners, and (iii) denied her job security. Docket # 61, Plaintiff's Rule 311 Statement of Contested and Uncontested Facts, Exhibit 2.

In addition, plaintiff makes reference to a judgment from the Puerto Rico Superior Court, San Juan Section, in a related discrimination case brought by her husband, John Belk, in which the judge made findings of fact concluding that (I) defendants were prejudiced against married couples in the firm; Docket # 61, Exhibit 6, at 9; (ii) defendants' mistrust of plaintiff had to do with their feeling that she had been dishonest with them by concealing her marriage with an associate; *Id.* at 15, 20; and that (iii) the trust which should prevail among proprietary partners did not exist. *Id.* at 23.

Assuming, for the sake of argument, that such statements are true, they merely demonstrate that defendants treated plaintiff differently because of the distrust which resulted from her undisclosed marriage to John Belk. Yet this distrust may have been partly triggered by the fact that, while a proprietary partner, plaintiff participated in matters pertaining to her husband's ascent in the law firm. See Docket # 48, Exhibit 15. Therefore, the forgoing facts, alone, are insufficient to demonstrate that the reason for such discrimination was that she was a woman.

Defendants have also established that they had a legitimate reason to terminate plaintiff's employment. The evidence which they presented demonstrates that the dissolution of the former law firm of MOCS was motivated by irreconcilable differences and a power struggle between two factions of proprietary partners at the law firm: the partners of the Tax Department, i.e. plaintiff and Ralph Sierra, Jr. on one side; and Fred Martínez, Lawrence Odell and José Calabria on the other.

While the particular details of every internal dispute between the two factions might never be entirely clear, one thing is undisputable: that defendants' decision to dissolve their partnership was rendered on a gender-neutral basis. The power struggle between the two factions of partners, and the adverse reaction to plaintiff's undisclosed marriage to a subordinate, had nothing to do with her gender, or with defendants' desire to prevent her from achieving full parity with the senior partners on account of her gender. One cannot seriously posit that a flourishing law firm which, for years, struggled through internecine partnership disputes and made genuine efforts to prevent the firm's dissolution, would finally decide to split in order to prevent plaintiff from obtaining what was promised her. It seems clear that defendants would have arrived to the same result regardless of her gender.

Plaintiff has failed to demonstrate the existence of a gender-based disparate treatment under Title VII. Since she had the burden of establishing intentional discrimination and was unable to do so, summary judgment is warranted.

### III. Individual liability of co-defendant partners Martínez, Odell and Calabria under Title VII.

Defendants argue that plaintiff's suit is without merit because partners, as agents, cannot be held individually liable under Title VII, and plaintiff failed to sue the only defendant which could arguably be held responsible: her former law firm of MOCS. In support of their statement, they cite recent federal court decisions which have, directly or indirectly, exempted an employer's agent from individual liability under Title VII. See, e.g. *Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587–8 (9th Cir.1993); *Grant v. Lone Star Co.*, 21 F.3d 649, 651–3 (5th Cir. 1994); *Smith v. Lomax*, 45 F.3d 402, 403–5 (11th Cir.1995); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir.1994); *U.S. E.E.O.C. v. AIC Sec. Investigations Ltd.*, 55

F.3d 1276 (7th Cir.1995); *Ball v. Renner,* 54 F.3d 664 (10th Cir.1995); *Dirksen v. City of Springfield,* 842 F.Supp. 1117, 1122–4 (C.D.Ill.1994); *Johnson v. Northern Indiana Public Service Co.,* 844 F.Supp. 466, 468–71 (N.D.Ind.1944); *Lowry v. Clark,* 843 F.Supp. 228, 229–31 (E.D.Ky.1994); *Smith v. Capitol City Club of Montgomery,* 850 F.Supp. 976 (M.D.Ala.1994); *Crawford v. West Jersey Health Systems,* 847 F.Supp. 1232 (D.N.J.1994); *Caplan v. Fellheimer Eichen Braverman & Kaskey,* 882 F.Supp. 1529, 1531 (E.D.Pa.1995); *Flamand v. American Intern. Group, Inc.,* 876 F.Supp. 356, 363 (D.P.R.1994).

Alternatively, defendants contend that since plaintiff never had an employment relationship with MOC, MOCS was an indispensable party which plaintiff had to include as a defendant in the complaint. In addition, defendants argue that even if MOC was a successor employer, it could not be held liable under Title VII, since plaintiff did not comply with the notice, continuity and solvency requirements of *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1236 (7th Cir. 1986).

In response, plaintiff asserts that defendants' interpretation of the forgoing individual liability jurisprudence is in no way conclusive. Through cases such as *Ruich v. Ruff, Weidenaar & Reidy, Ltd.,* 837 F.Supp. 881 (N.D.Ill.1993) (where a district court stated that "the courts that have ruled on personal liability under Title VII have considered whether the 'agent' is liable as an 'employer,' . . . [whereas a partner is] not an agent but . . . the employer himself"), 837 F.Supp. at 884; and *Janopoulos v. Harvey L. Walner & Assocs., Ltd.,* 835 F.Supp. 459 (N.D.Ill.1993) (where the court held that the owner of a professional corporation was an alter ego of the corporation and was thus an "employer" for the purposes of liability under Title VII), plaintiff attempts to demonstrate that there is, at best, a conflict among the circuits regarding this issue.

As to defendants' assertions regarding MOC's successor employer liability, plaintiff argues that she could not possibly have sued MOCS because its assets had already been liquidated. More importantly, she contends that since she is suing for damages, defendant MOC and MOCS would be joint tortfeasors. Thus, plaintiff contends that she was under no obligation to bring MOCS to the present action. *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Intern., Inc.,* 982 F.2d 686 (1st Cir.1993) ("it is not necessary for all joint tortfeasors to be named as defendants in a single law suit"). *Id.* At 691. Plaintiff further avers that she could not have complied with the notice requirement since the dissolution of MOCS and creation of MOCS occurred almost simultaneously; and that the continuity and solvency requirements are met in this case, since MOC kept MOCS' clients, staff, records and physical address, among other things.

Although it is unclear whether the partners and their spouses in the instant case could escape liability as individual employers, we need not address the issue at this point, since, as stated above, plaintiff does not comply with the other requirements which are needed to establish a Title VII gender discrimination case. For similar reasons, we need not proceed to analyze whether MOC is a successor employer subject to Title VII liability.

## IV. Pendent jurisdiction claims

■ It is hornbook law that a district court has discretion to exercise supplemental jurisdiction over the state law claims where the state and federal claims derive from a common nucleus of operative facts. *See,* 28 U.S.C. sec. 1367; *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Nevertheless, where, as here, all federal claims warrant dismissal prior to trial, the district court should decline to exercise supplemental jurisdiction.

It has been stated that the holding in *Gibbs* "seems clearly to require dismissal without action on the merits and without any exercise of discretion if all the federal claims . . . are found to be short of trial, deficient." *Snowden v. Millinocket Regional Hosp.,* 727 F.Supp. 701, 709 (D.Me.1990). Such a result is warranted in view that "[t]he power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial'

federal claim in the lawsuit". *Newman v. Burgin*, 930 F.2d 955, 963 (1st Cir.1991).

■ Although District Courts are not obligated to dismiss pendent state law claims, in the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims. In such a case, state-law claims should be dismissed. *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988); citing *Gibbs*, 383 U.S. at 726–727, 86 S.Ct. at 1139–1140; see *Mercado–García v. Ponce Federal Bank*, 979 F.2d 890, 896 (1st Cir.1992); *Rivera v. Murphy*, 979 F.2d 259, 264 (1st Cir.1992); *Figueroa Ruiz v. Alegría*, 896 F.2d 645 (1st Cir.1990); cf *Vega v. Kodak Caribbean*, 3 F.3d 476, 478 (1st.Cir.1993) (holding that "when the district court disposed of the ADEA claims, the pendent claims became subject to dismissal for want of subject matter jurisdiction"); *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 47 (1st Cir.1991) (stating that "since federal question jurisdiction hinged on that [dismissed] count, and there was no complete diversity of citizenship or other cognizable basis for the assertion of subject matter jurisdiction in the district court, the pendent state law claims were properly dismissed under the rule of *United Mine Workers v. Gibbs* ").

Supplemental jurisdiction should be declined in this case in view that the state law claims substantially predominate over the federal claims. The Supreme Court has held that judicial economy, convenience, fairness and comity favors "a decision to relinquish jurisdiction" when "state issues predominate, whether in terms of proof, of the scope of the issued raised, or the comprehensiveness of the remedy sought." *Carnegie–Mellon*, 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7, citing *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. Since plaintiff is not entitled to any award under Title VII, the only award plaintiff could, in any event, pursue would be under state tort law.

In view of the above discussion, defendants' Second Motion for Summary Judgment is **GRANTED (Docket # 48)**, and plaintiff's complaint for Title VII violations is **DISMISSED.** We also decline to exercise jurisdiction over plaintiff's remaining state claims against the defendants. Judgment shall be entered accordingly.

**SO ORDERED.**