Stewart v. Mary Hitchcock Memorial     CV-95-597-M     07/01/97

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Betty S. Stewart,
     Plaintiff

v.                                         Civil No. 95-597-M

Mary Hitchcock Memorial Hospital,
Thomas Ozahowski, and Beth Wolf,
     Defendants

## O R D E R

Betty Stewart brings this action seeking compensation for alleged acts of sexual harassment and gender-based discrimination.  Counts 1 and 2 of the amended complaint set forth claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  Counts 3 through 5 allege various state law claims, over which plaintiff asks the court to exercise supplemental jurisdiction.  Defendants, Mary Hitchcock Memorial Hospital (the "Hospital"), Thomas Ozahowski, and Beth Wolf, deny any actionable wrongdoing and move for summary judgment.

### Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable

inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving party carries its burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial, demonstrating "some factual disagreement sufficient to deflect brevis disposition." Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991). See also Fed. R. Civ. P. 56(e). That burden is discharged only if the cited disagreement relates to a genuine issue of material fact. Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992). "Generally speaking, a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l. Assoc'n of Machinists and Aerospace Workers v. Winship Green Nursing Center 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Facts

Although the affidavit plaintiff has submitted in opposition to defendants' motion for summary judgment contradicts (or, at a minimum, differs from) her deposition testimony with regard to several substantive issues, the undisputed material facts of

2

record are as follows.[1]  Where the facts are disputed (and the parties' differing views of the facts are properly supported in the record), the court will, for the purposes of this order, construe them in the light most favorable to plaintiff.

I.   Background.

Defendants Thomas Ozahowski and Beth Wolf are employees of the Hospital.  Ozahowski is a registered nurse who has been employed in the Hospital's electrophysiology lab (the "EP lab") since 1985.  Wolf is the administrator of the Cardiology Department and is responsible for the management of six laboratories within that department, including the EP lab.  Among

---

[1]  Where, as here, an affidavit submitted in opposition to a motion for summary judgment contradicts, without explanation, a party's earlier deposition testimony, the court will ignore the contradictory elements of the affidavit.  See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed. . . . In these circumstances, we are persuaded that plaintiff's affidavit should be disregarded in considering the propriety of summary judgment."); see also Babrocky v. Jewel Food Co. & Retail Meatcutters, 773 F.2d 857, 861-62 (7th Cir. 1985); Foster v. Arcata Associates, Inc., 772 F.2d 1453, 1462 (9th Cir. 1985); Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969).

Perhaps equally disturbing is that plaintiff (through her counsel) frequently makes statements and arguments in her papers which are not supported by her references to the record.  While a certain modicum of hyperbole may be expected when a party advances arguments, consistent misleading citations to the record regarding facts is particularly troubling.  See, e.g., Stewart affidavit at para. 32 and compare with plaintiff's objection to motion to strike (document no. 25) at para. 11 and Stewart deposition at 417-18.

other things, she is responsible for personnel matters in the EP lab.

In 1992, after working for the cardiology department as a temporary scheduling secretary, plaintiff was hired as a full-time laboratory technician in the EP lab. At the time, three nurses, including Ozahowski, worked in the EP lab. Plaintiff assisted those nurses by, among other things, cleaning rooms between cases, ordering supplies, and running errands. Wolf supervised plaintiff and the three nurses, conducting performance evaluations and determining disciplinary actions and raises. Ozahowski and the other two nurses did, however, direct some of plaintiff's day-to-day activities.

Initially, plaintiff worked four 10 hour days each week in the EP lab. Subsequently, however, she decided that she wished to obtain a nursing degree. To accommodate her desire to pursue additional education, the Hospital provided her with tuition reimbursement and allowed her to change her schedule to three 12 hour days each week (plaintiff used vacation time to account for the remaining unworked hours during each week). Shortly before plaintiff left the Hospital, however, the Hospital returned her to a 10 hour work day. It claims that it did so because it perceived that plaintiff's three-day work week was not making efficient use of her time and was contributing to friction in the EP lab. Plaintiff claims that the change in her schedule was not

4

motivated by legitimate business concerns and, instead, was done in retaliation for her having reported incidents of alleged sexual harassment in the EP lab. Plaintiff worked in the EP lab for approximately 2 years, until she requested (and received) educational leave in November of 1994.

II. The Hospital's Sexual Harassment Policy.

At all times relevant to this proceeding, the Hospital had a policy against sexual harassment, which was detailed in a personnel manual provided to all employees at their orientation. The manual explained, among other things, the procedures by which employees should report incidents of alleged sexual harassment. Additionally, the Hospital had posters in various public locations which explained the sexual harassment policy and listed the individuals at the Hospital who should be contacted to report any incidents of harassment or discrimination. Plaintiff admits that she was generally aware of the Hospital's sexual harassment policy.

Dr. Wayne Weiner is the Hospital's director of employee relations and education. In that capacity, he is responsible for equal employment opportunity issues at the Hospital and the investigation of reports of sexual harassment. At his deposition, Dr. Weiner testified that in addition to providing employees with the various publications detailing the Hospital's sexual harassment policy, the Hospital also conducted numerous

5

seminars or in-service training sessions on sexual harassment. Those training sessions were open to all Hospital employees (i.e., support staff, physicians, administrators, etc.) and were well attended. He also noted that at orientation, in addition to the personnel manual, each employee was provided with a tri-fold pamphlet addressing the Hospital's sexual harassment policy. Each employee was required to sign a form, indicating that he or she had received a copy of those materials.

III. The Work Environment.

In support of her claim that she was subjected to a hostile work environment during her two year tenure in the EP lab, plaintiff chronicles several incidents during which she observed Hospital employees using foul language, making demeaning sexually related comments, or telling jokes laced with sexual innuendo. She also identifies three specific instances during which she claims to have been the victim of hostile or demeaning verbal attacks and/or gender-based discrimination.

With regard to the former category of incidents, plaintiff says that her co-employees frequently used foul language and occasionally told off-color jokes, some of which were of a sexual nature. She also claims that on one occasion Ozahowski commented on the physical appearance of a sedated overweight female patient, saying something about the size of her breasts and expressing disgust that anyone could allow herself to become so

6

obese.  On another occasion, plaintiff claims that Ozahowski made a comment about a male patient's genitals.  Neither comment was directed to the patient; rather, plaintiff says that Ozahowski made those comments to other members of the EP lab.

Additionally, plaintiff claims that Ozahowski spoke negatively about another nurse's pregnancy, saying that her condition was causing him to assume more duties at work.  She also says that Ozahowski made comments about the physical appearance of female product vendors who appeared periodically in the EP lab and claims that he would "stop what he was doing in order to escort an attractive female sales representative around the laboratories."  Stewart affidavit at para. 9.  Plaintiff was also troubled by her perception that Ozahowski would purposefully leave his wedding band in the laboratory when he attended professional conferences.

Plaintiff also says that "pornographic pictures were common place" in the EP lab.  Plaintiff's memorandum in opposition to summary judgment at 14.  In support of that rather dramatic claim, plaintiff notes that a Hospital employee once brought a copy of Madonna's recent book to work, which apparently contains some sexually suggestive photographs.[2]  Additionally, plaintiff

_____

[2]  At her deposition, however, plaintiff admitted that she was not offended by the fact that someone brought the book to the Hospital or by the fact that one of the physicians reviewed the book and told some of the staff members that he was a Madonna

7

points out that on one occasion lab personnel displayed in a public area a magazine advertisement for male underwear (displaying a partially clothed male model) and on another occasion someone displayed a postcard which depicted a man in a bathing suit flexing his muscles.

Plaintiff also identifies three specific incidents in which Ozahowski allegedly directed abusive and/or sexually demeaning comments directly at her. The first occurred in 1993, shortly after plaintiff began working as a technician in the EP lab. She says that Ozahowski asked her to assist him and, when he learned that she had already been asked by another nurse to retrieve a table for a medical procedure, Ozahowski said that the other nurse could "get her own fucking table." Stewart affidavit at para. 4. Then, in June of 1993, when plaintiff asked if she could be of any help, Ozahowski said, "You can go over and give Mark a blow job because his wife is away and he's not getting any." Id. at para. 20.

Although plaintiff told the other two nurses in the EP lab about Ozahowski's 1993 comments, she did not report those statements to Wolf (plaintiff's personnel supervisor) for approximately nine months. It was not until March of 1994, a day after Wolf informed plaintiff that she was concerned about

---

fan. Steward affidavit at 349.

plaintiff's job performance and believed that there were communication problems in the EP lab, that plaintiff notified Wolf of the two 1993 incidents in which Ozahowski had directed sexually demeaning and/or hostile comments to her.

Shortly thereafter, plaintiff told Ozahowski that she was frustrated by his periodic absences from the lab, pointing out that he had once caused a delay in a medical procedure. Plaintiff says that Ozahowski lost his temper and explained that his absences were occasioned by him being "off in the bathroom masturbating," to which he added, "Want to come in and help?" Ozahowski denies having made that comment. Approximately one month later, plaintiff met with Wolf for a performance evaluation. At that meeting, apparently after learning that Wolf planned to issue her a written warning for failing to prioritize her work, failing to follow orders, and failing to adhere to scheduled hours, plaintiff told Wolf of Ozahowski's alleged masturbation comment.[3]

---

[3] Before meeting with plaintiff, Wolf prepared a written warning, which she planned to review with plaintiff and then place into plaintiff's personnel file. However, after discussing the situation with plaintiff, Wolf decided not to issue the written warning and destroyed it.

IV.   The Hospital's Response.

Either that day or the following day, Wolf met with Ozahowski, told him of plaintiff's complaint, and issued him a final written warning.  Ozahowski acknowledged that he made the "blow job" comment, but apparently denied making any other inappropriate comments.  Wolf explained to Ozahowski that if another incident of that sort occurred, he would be fired.  A permanent statement regarding Ozahowski's conduct and the discipline imposed was placed in his personnel file.  Wolf then notified Wayne Weiner, the Hospital's director of employee relations and education, of plaintiff's allegations and the remedial steps Wolf had taken in response.  At her deposition, Wolf explained that other than confronting Ozahowski, warning him that similar conduct would result in his immediate termination, making a record of the same in his personnel file, and referring the matter to Dr. Weiner, she took no further disciplinary action against Ozahowski because: (1) no one had ever reported any similar conduct on the part of Ozahowski; (2) after disciplining Ozahowski, she believed that he was "devastated" and she understood that he subsequently apologized to plaintiff and Dr. Greenberg (the individual referenced in his comment as "Mark"); and (3) based upon her working relationship with Ozahowski, she believed that his vulgar and offensive behavior was an "inappropriate offhanded error and he was appropriately remorseful for it."  Wolf deposition at 113.

10

After speaking with Wolf, Dr. Weiner contacted Ozahowski and explained that his behavior was unacceptable and, like Wolf, warned him that if he engaged in any similar conduct in the future he would be fired. Weiner then met with plaintiff and asked whether she felt that she was still being subjected to harassing behavior. Plaintiff responded that she was not. Weiner then investigated plaintiff's complaint and conducted a "gender survey," aimed at determining whether employees in the EP lab felt that there were any instances in which hospital staff or employees had engaged in inappropriate, harassing, or demeaning conduct. Based on his investigation, Dr. Weiner concluded that there was not a problem in the cardiology department or, more specifically, in the EP lab. Weiner deposition at 37. Finally, after learning that Dr. Greenberg had spoken to plaintiff about Ozahowski's comment to her, Dr. Weiner told Dr. Greenberg not to involve himself in personnel matters and specifically instructed him not to speak with plaintiff about the situation with Ozahowski.[4]

_____

[4] After Wolf informed plaintiff that several of the doctors were unhappy with her work performance, plaintiff approached each of those doctors. She claims that when she asked Dr. Greenberg about her performance, he responded by saying, "We should get you for insubordination. Because of you Tom [Ozahowski] has a black mark on his record. When you get involved things get very confusing." Stewart affidavit at paras. 33-34. Dr. Greenberg acknowledges having met with plaintiff to discuss her performance in the EP lab, but denies having made any such comment. Greenberg deposition at 54-55.

11

Plaintiff claims that after she reported Ozahowski's inappropriate conduct to Wolf and Weiner in April of 1994, she did not receive a raise and/or promotion to which she believes she was entitled. She also claims that the Hospital changed her working hours and added a half-hour to her work day by requiring her to work through lunch (without a commensurate raise in pay). At her deposition, however, plaintiff admitted that she was scheduled to work from 6:30 a.m. to 5:00 p.m. with a half-hour unpaid lunch (i.e., 10 working hours) and that she was paid for 10 hours. She also acknowledged that, "[e]verybody is supposed to take lunch, but if you couldn't take lunch you worked through your lunch." Stewart deposition at 252. At a minimum, plaintiff's deposition testimony undermines her claim that the Hospital required her to work through an unpaid lunch break.

Essentially, plaintiff seems troubled by the fact that the Hospital refused to treat her like a nurse (she was not a nurse) at least with regard to her scheduled work hours. See Stewart deposition at 253-54. Eventually, in November of 1994, plaintiff decided that she could no longer perform her duties as an EP lab technician, reportedly due to her inability to adequately deal with stress she was experiencing on the job. Accordingly, she requested and received permission to take educational leave.

12

## Discussion

Title VII of the Civil Rights Act of 1964 (as amended) makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "Sexual harassment," which includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, is prohibited under Title VII and may appear in either of two variants. "It is now well established that two forms of sexual harassment violate Title VII's prohibitions against workplace inequality: i) quid pro quo and ii) hostile work environment harassment." Tomka v. Seiler Corp., 66 F.3d 1295, 1304-05 (2d Cir. 1995). Here, plaintiff's claims are limited to the latter form of gender-based discrimination.

The Supreme Court recently held that a hostile work environment exists (and Title VII is violated) "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank v. Vinson,

13

477 U.S. 57 (1986)).  With regard to hostile environment claims under Title VII, the court observed that:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.
>
> *  *  *
>
> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Id. at 21-22, 23.

Writing in a similar vein for a unanimous panel of the Court of Appeals for the Seventh Circuit, Chief Judge Posner recently observed:

> The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women. . . . It is not designed to purge the workplace of vulgarity.  Drawing the line is not always easy.  On one side lie sexual assaults; other physical contacts, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures.  On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

14

<u>Baskerville v. Culligan Intern. Co.</u>, 50 F.3d 428, 430 (7th Cir. 1995) (citations omitted). Title VII provides a plaintiff with an actionable claim when the workplace is <u>permeated</u> with discriminatory intimidation, insult, and ridicule which is so severe or pervasive that it alters the conditions of the plaintiff's employment and creates an abusive working environment. <u>Forklift Systems</u>, 510 U.S. at 21; <u>Meritor Savings Bank</u>, 477 U.S. at 67. Title VII is not, however, designed to rid the workplace of all offensive, rude, boorish, and discourteous behavior; it does not promise a socially sterile or perfectly civil work environment. So, for example, while occasional crass language or off-color humor in the workplace may be both unprofessional and socially inappropriate, it does not, without more, provide a foundation upon which to build a Title VII claim. The mere utterance of a statement which "engenders offensive feelings in an employee would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." <u>Meritor</u>, 477 U.S. at 67 (quoting <u>Rogers v. EEOC</u>, 454 F.2d 234, 238 (5th Cir. 1971)). <u>See also</u> <u>Stahl v. Sun Microsystems, Inc.</u>, 19 F.3d 533, 538 (10th Cir. 1994) ("If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."); <u>Rabidue v. Osceola Refining Co.</u>, 584 F.Supp. 419, 430 (E.D. Mich. 1984) ("Indeed, it cannot seriously be disputed that in some work environments, humor and language are rough hewn and vulgar. . . .

15

It must never be forgotten that Title VII is the federal court mainstay in the struggle for equal employment opportunity for the female workers of America. But it is quite different to claim that Title VII was designed to bring about a magical transformation in the social mores of American workers.").

I.  Count I - Hostile Work Environment.

Considering the totality of the circumstances surrounding plaintiff's two-year employment in the EP lab as described by her (including the statements which Ozahowski admits making as well as those he denies), the court concludes that plaintiff was not subjected to an environment that was sufficiently hostile or permeated with discriminatory intimidation, insult, or ridicule to be actionable under Title VII. To be sure, Ozahowski's comments (both admitted and attributed) were rude, offensive, and unprofessional. And, plaintiff may very well have been personally offended by his alleged flirtatious behavior, or the use of foul language or off-color humor by her co-workers. However, neither Ozahowski's comments nor the other circumstances chronicled by plaintiff were sufficiently severe or pervasive to alter the conditions of plaintiff's employment by creating an abusive working environment.

The line between vulgar, boorish behavior which is not actionable under Title VII, and actionable gender-based harassment may, in certain cases, be difficult to discern. Here,

16

however, one could not reasonably conclude that the conduct described by plaintiff crosses that line. Plaintiff has not alleged that she was subjected to any unwelcome physical touching, uninvited sexual solicitations, or intimidating words or acts. See Baskerville, 50 F.3d at 428. Although she does claim to have been routinely subjected to "pornographic" pictures, viewing the totality of the circumstances alleged (and properly supported) in the light most favorable to plaintiff, a reasonable trier of fact could well conclude that she was subjected to occasional vulgar banter, foul language, humor tinged with sexual innuendo, and at least one (and possibly two) sexually explicit and demeaning comments by Ozahowski. In the overall context of her two years of employment in the EP lab, however, the facts described are not, as a matter of law, "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment.'" Harris v. Forklift Systems, Inc., 510 U.S. at 21.

Moreover, the Hospital's response to plaintiff's disclosure regarding Ozahowski's comments was prompt and, given that plaintiff admitted to Dr. Weiner that the harassment stopped, it was appropriate and effective. Employers are not strictly liable under Title VII for acts of sexual harassment perpetrated by their employees. But, neither are they automatically shielded from liability simply because they have a policy against discrimination enforced by an established grievance procedure.

17

Meritor Savings Bank, 477 U.S. at 72-73. Instead, employers are liable if they knew, or should have known, of sexual harassment and failed to take "'appropriate steps to halt it.'" Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 437 (1st Cir. 1997) (quoting Lipsett v. University of Puerto Rico, 864 F.2d 881, 901 (1st Cir. 1988)).

An employer is obligated to take reasonable steps, under the circumstances, to end harassment. DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir. 1980). "What is appropriate remedial action will necessarily depend on the particular facts of the case — the severity and persistence of the harassment, and the effectiveness of any initial remedial steps." Waltman v. International Paper Co., 875 F.2d 468, 479 (5th Cir. 1989). An employer is not obligated to implement the most effective remedial measures as long as it responds with reasonably adequate remedial efforts. Spicer v. Commonwealth of Virginia, Dep't of Corrections, 66 F.3d 705, 710-11 (4th Cir. 1995) (en banc). Accordingly, an employer who has notice of allegations of sexual harassment will not be liable under Title VII if "[i]t took the allegations seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of such investigations." Carmon v. Lubrizol Corp., 17 F.3d 791, 795 (5th Cir. 1994).

18

On the factual record presented for summary judgment, it is undisputed that plaintiff did not notify the Hospital of Ozahowski's sexually suggestive remarks before March of 1994, when she told her supervisor, Beth Wolf, about those remarks in the context of a discussion related to general workplace hostility and friction. Wolf promptly confronted Ozahowski, issued a written warning which was placed in his personnel file, orally warned him that any similar conduct in the future would result in immediate discharge, and also referred the matter to Dr. Weiner, the Hospital's head of employee relations. Dr. Weiner then personally spoke to Ozahowski, issued a similar warning, investigated plaintiff's allegations of workplace hostility, and met with plaintiff on several occasions to verify that the situation had been remedied. Ozahowski apologized to plaintiff and she acknowledged that she was no longer subjected to sexually suggestive comments or demeaning statements.

In light of these uncontested facts, the court concludes that the Hospital responded in both a timely and appropriate manner. It took prompt action aimed at halting any possible harassment of plaintiff. Moreover, the measures taken by the Hospital were reasonable and effective — the inappropriate behavior stopped.

II.  Count 2 - Retaliation and/or Constructive Discharge.

In count 2 of the amended complaint, plaintiff claims that after she reported the alleged instances of harassment and discrimination, her working conditions worsened to the point that a reasonable person would have resigned or quit.  She attributes the deterioration in her working environment to defendants' efforts to retaliate against her.  Specifically, she claims that after she reported her concerns about the conditions in the EP lab, she did not receive a raise and/or promotion that she believes she was scheduled to receive.  However, she has failed to support her claim that she was entitled to a raise or promotion with any admissible evidence.  Instead, she relies only upon inadmissible hearsay and unsupported conjecture, see, e.g., Stewart affidavit at para. 22, which the court may not consider in addressing defendants' motion for summary judgment.  See Fed. R. Civ. P. 56(e).

With regard to plaintiff's claims concerning changes in her work schedule, the facts of record simply fail to support the legal conclusion that she was the target of any unlawful discriminatory retaliation.  At some point in 1994 (after she reported Ozahowski's conduct to Wolf), the Hospital modified the hours during which she was expected to work.  However, neither her benefits nor salary were adversely affected.  See Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 26 (1st Cir. 1997) ("Salary considerations are important in determining whether a

20

job transfer can support a claim of constructive dismissal."). In fact, she admitted that she did not object to the change in her working hours, but rather objected to the fact that only her schedule (and not the EP lab nurses' schedules) had been changed. Stewart deposition at 253-56. Critically, the record is devoid of any facts which might suggest that the Hospital changed plaintiff's hours for discriminatory or retaliatory reasons, rather than based upon its legitimate interest in the smooth operation of the EP lab and effective patient care.

Likewise, plaintiff's claims that her job duties were unlawfully changed also fail. First, based upon her deposition testimony, it is unclear whether the Hospital changed her job duties at all. See Stewart deposition at 256-61 (it appears that the Hospital simply listed plaintiff's duties and prioritized the order in which she was expected to perform them). Second, to the extent that plaintiff's duties were actually altered, the Hospital has demonstrated that its actions were based upon non-discriminatory decisions aimed at improving communication in the EP lab and improving plaintiff's ability to perform her job and prioritize her work. In response, plaintiff has failed to produce evidence sufficient to permit a reasonable trier of fact to conclude that the Hospital's proffered justification for

"altering" her job duties was a pretext and that its conduct was actually motivated by a desire to retaliate against her.[5]

Finally, to the extent that plaintiff claims to have stated a viable cause of action for constructive discharge (as distinguished from unlawful, gender-based retaliation), that claim too fails. Constructive discharge occurs when an employer's actions, measured under an objective standard, "have forced an employee to resign." Serrano-Cruz, 109 F.3d at 26. To meet the objective standard, the evidence must support a finding

---

[5] The Court of Appeals for the First Circuit has recognized that:

> On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.

Fennell v. First Step Designs, Ltd., 83 F.3d 526, 536 (1st Cir. 1996). Nevertheless, even applying the burden-shifting analysis and assuming that plaintiff has established a prima facie case of retaliation under the framework articulated in McDonnel Douglas Corp. v. Green, 411 U.S. 792 (1973), the Hospital has responded with "sufficient competent evidence . . . to permit a rational factfinder to conclude that there was a 'nondiscriminatory reason' for the challenged employment action, thereby displacing the presumption of intentional discrimination generated by the prima facie case." Byrd v. Ronayne, 61 F.3d 1026, 1031 (1st Cir. 1995) (citation omitted). See also Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254-55 (1980). Accordingly, the dispositive question then becomes whether plaintiff has established genuine issues of fact with regard to her claim that: (1) the Hospital's stated reasons for "altering" her job duties were pretextual; and (2) her change in job duties was motivated by a desire to retaliate against her for having formally complained about her working conditions. See Fennell v. First Step Designs, Ltd., 83 F.3d at 536. For the reasons articulated above, she has failed to meet that burden.

that the working conditions were so "difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Greenberg v. Union Camp Corp., 48 F.3d 22, 27 (1st Cir. 1995) (internal quotations omitted). Under this objective standard, "an employee may not . . . be unreasonably sensitive to a change in job responsibilities." Serrano-Cruz, 109 F.3d at 26. Here, plaintiff's claims fall short of the mark. The record does not support even an inference that, in retaliation for having reported incidents of alleged gender-based discrimination, the Hospital created a work environment that was so hostile or unpleasant that a reasonable person would have felt compelled to leave.

Moreover, because the court has determined that defendants' conduct was not discriminatory within the meaning of Title VII, plaintiff cannot prevail with regard to her Title VII constructive discharge claim. See Waymire v. Harris County, Texas, 86 F.3d 424, 428 (5th Cir. 1996) (because defendant not liable under Title VII, court need not consider constructive discharge claim); Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1002 (10th Cir. 1996) (element of constructive discharge claim based on sexual harassment under Title VII is gender-based intolerable working conditions); Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 428 (8th Cir. 1984) (constructive discharge claim must fail where plaintiff fails to show sexual harassment under Title VII).

23

## Conclusion

Defendants' motion for leave to file a reply memorandum (document no. 22) is granted. Defendants' motion for summary judgment (document no. 17) is granted in part and denied in part. Defendants are granted summary judgment with regard to Counts 1 and 2 of plaintiff's amended complaint. Pursuant to 28 U.S.C. § 1367(c)(3), the court declines to exercise its supplemental jurisdiction over the remaining claims set forth in plaintiff's amended complaint (Counts 3 through 5), as they are based solely upon state law. Accordingly, those counts are dismissed without prejudice to refiling in state court. Defendants' motion to strike portions of plaintiff's affidavit (document no. 23) is granted to the extent that the court has disregarded those portions of plaintiff's affidavit which are inadmissible under Fed. R. Civ. P. 56(e). In all other respects, that motion is denied as moot.

The clerk of the court is instructed to enter judgment in favor of defendants in accordance with the terms of this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

July 1, 1997

24

cc:  Joni N. Esperian, Esq.
     Julie Ann Quigley, Esq.