UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



No. 96-2251

MARGARITA SERAPION,

Plaintiff, Appellant,

v.

FRED H. MARTINEZ, ET AL.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]



Before

Selya, Circuit Judge,

Coffin and Cyr, Senior Circuit Judges.



Judith  Berkan,  with  whom  Mary Jo Mendez and Rosalinda Pesquera
were on brief, for appellant.
Graciela J. Belaval, with whom Alvaro R. Calderon, Jr. and
Martinez, Odell & Calabria were on brief, for appellees.



July 18, 1997



SELYA,  Circuit  Judge .   This appeal requires us to explore

a gray area in the emerging jurisprudence of Title VII, 42 U.S.C.

SS 2000e to 2000e-17 (1994). Having completed that task, we

conclude  that  while  Title VII's employment-related shelter might in

certain  circumstances extend to a person who is a partner in a law

firm,  plaintiff-appellant Margarita Serapion, a partner in the now-

disbanded law firm of Martinez, Odell, Calabria & Sierra (the

Firm), is not entitled to such shelter here. Consequently, we

affirm the lower court's entry of summary judgment in the

defendants' favor.

In explaining our rationale, we take a slightly

unorthodox course. We begin with the facts, then shift to a

discussion  of the statutory scheme, and then resume our historical

account  by  describing  the course of the litigation. In succession,

we thereafter rehearse the summary judgment standard, limn the

doctrinal parameters of the requisite Title VII inquiry, address

the merits, iron out a procedural wrinkle, and at long last

conclude.

I. THE FACTUAL PREDICATE

Serapion  earned  a  distinguished reputation as a certified

public accountant before deciding to switch careers. After

graduating from the University of Puerto Rico Law School with

honors in 1982, she joined the San Juan law firm of Colorado,

Martinez, Odell, Calabria & Sierra as an associate. She left in

1983 for a stint in government service but returned in 1985. In

the interim, Colorado had departed and the partnership had been

2

reconstituted. Approximately one year later, the appellant was

mitted a

non-proprietary"  partner ad into the Firm as a "junior" partner (sometimes termed  " ). While this status did not give her any

equity position, it did give her some profit distribution units

(PDUs) 1  and  enabled her to participate in meetings of the Board of

Partners (a body which comprised all the partners, senior and

junior in the aggregate, roughly half the Firm's lawyers and

which had the ultimate responsibility for management and

policymaking).

In 1990, Serapion became what is variously described as

a "senior" or "proprietary" partner. Theretofore the Firm's four

name  partners  (all  males) were the only other proprietary partners.

They  enjoyed  equality among themselves in respect to compensation,

PDUs, benefits, and equity, and they promised Serapion that she

would be elevated to an equal partnership in three years. In the

meantime,  her  status  as  a proprietary partner brought about several

changes in her working conditions: she received a 4% equity

interest in the Firm (ceded 1% by each name partner); she assumed

pro rata liability for the Firm's debts, losses, and other

obligations; and she became a voting member of the Executive

1Each partner received an allotment of PDUs, and the Firm's
profits  were  distributed  periodically to the partners in proportion
to  the  number  of  PDUs  which each partner held. These distributions
were over and above the recipients' base salaries. At all times
material hereto, the name partners held 100 PDUs apiece. The
junior partners held varying amounts, ranging from 20 to 45 PDUs
apiece.

3

Committee  (a  five-member  group which was responsible for the Firm's

day-to-day management). When the appellant became a proprietary

partner, the Firm increased her allocation of PDUs to 75 units.

Concomitantly , she began reaping a correspondingly larger share of

the Firm's profits. Under the terms of the 1990 agreement, her

allotment  of  PDUs  (and,  therefore, her share of the profits) was to

continue  to  rise in increments until the end of 1992 when Serapion

would achieve full parity with the four name partners.

Despite these emoluments, Serapion was not on an equal

footing  with  the name partners. Each of them had a greater equity

interest (24% apiece) and a more munificent compensation package

(roughly one-third higher than hers in 1990, although the gap

gradually  closed). The difference in compensation was largely, if

not entirely, a function of the disparate allocation of PDUs.

Still, although her allotment of PDUs was less than that of the

name partners, it was nonetheless significantly greater than that

of even the most well-endowed junior partner.

Serapion alleges that three of her partners (Fred H.

Martinez, Lawrence Odell, and Jose Luis Calabria) never intended

that a woman would achieve parity. These partners, she says,

connived to prevent her from reaping the fruits of her bargain,

eventually demanding that she sign an agreement which would have

significantly diminished her authority within the Firm. When

Serapion  stood her ground, the trio caused the Firm to dissolve in

1992 (shortly before the expiration of the three-year phase-in

period) and simultaneously forged a new partnership called

4

"Martinez,  Odell & Calabria." The nascent firm included the three

men,  as  well  as  most  of  the Firm's other lawyers. The founders did

not invite either Serapion or Sierra (the remaining proprietary

partner) to join.

II. THE STATUTORY SCHEME

We  pause  at  this juncture to sketch the legal landscape.

Title VII is one of the brightest stars in the firmament of this

nation's antidiscrimination laws. Generally speaking, it bars

certain employment-related actions undertaken on the basis of

impermissible criteria (such as gender). See, e.g., Smith v. F.W.

Morse & Co., 76 F.3d 413, 420 (1st Cir. 1996). In relevant part,

Title VII provides:

It shall be an unlawful employment
practice for an employer 
(1) to fail or refuse to hire or to
discharge any individual, or otherwise to
discriminate against any individual with
respect to his compensation, terms,
conditions, or privileges of employment,
because of such individual's race, color,
religion, sex, or national origin.

42 U.S.C. S 2000e-2(a)(1).

The Firm is plainly an employer for Title VII purposes.

After all, an employer is defined by statute as "a person engaged

in an industry affecting commerce," and the statute makes clear

that  "a  person" in this context can include a partnership. Id. at

S 2000e(a)-(b). The rub is whether Serapion is an employee.

Although the language we have quoted speaks of "any

individual," courts long ago concluded that Title VII is directed

at, and only protects, employees and potential employees. See,

5

e.g. ,  Vera-Lozano  v.  Inte rnational Broad., 50 F.3d 67, 69 (1st Cir.

1995); Broussard v. L. H. Bossier, Inc., 789 F.2d 1158, 1159 (5th

Cir.  1986);  s ee generally Keyes v. Secretary of the Navy, 853 F.2d

1016,  1026  (1st  Cir.  1988) (noting that "Title VII does not presume

to  obliterate all manner of inequity"). We know, moreover, that a

single individual in a single occupational setting cannot be both

an  employer  and an employee for purposes of Title VII. See, e.g.,

Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 80-81 (8th

Cir. 1996), cert. denied, 117 S. Ct. 1694 (1997); EEOC v. Dowd &

Dowd,  Ltd.,  736  F.2d  1177, 1178 (7th Cir. 1984); Johnson v. Cooper,

Deans & Cargill, 884 F. Supp. 43, 44 (D.N.H. 1994). Even so, the

parameters of the term "employee" have proven elusive. Title VII

defines an employee only as "an individual employed by an

employer,"  42 U.S.C. S 2000e(f), a turn of phrase which chases its

own tail. See Broussard, 789 F.2d at 1160; see also Nationwide

Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992) (terming nearly

identical language in the ERISA statute, 29 U.S.C. S 1002(6),

"completely circular").

Given  the  unhelpful  nature of the supplied definition, we

are compelled to look for assistance in other federal

antidiscrimination statutes that contain similar definitions of

"employee," such as the Age Discrimination in Employment Act

(ADEA), 29 U.S.C. SS 621-634 (1994), the Employee Retirement and

Income  Security  Act  (ERISA), 29 U.S.C. SS 1001-1461 (1994), and the

Fair Labor Standards Act (FLSA), 29 U.S.C. SS 201-219 (1994). We

regard Title VII, ADEA, ERISA, and FLSA as standing in pari passu

6

and endorse the practice of treating judicial precedents

interpreting  one  such  statute as instructive in decisions involving

another.   See , e.g., Oscar Mayer & Co. v. Evans, 441 U.S. 750, 756

(1979); Lorillard v. Pons, 434 U.S. 575, 584 (1978); Wheeler v.

Hurdman, 825 F.2d 257, 263 (10th Cir. 1987); Hyland v. New Haven

Radiology Assocs., 794 F.2d 793, 796 (2d Cir. 1986).

Of course, we are not remitted solely to statutory

parallels. There is a developing jurisprudence under Title VII.

In it, we detect precedential value not only in cases which

actually involve partnerships, but also in decisions which have

determined the status of individuals by analogy to a partnership

paradigm (even though the individuals involved were principals of

entities  other than partnerships). See, e.g., Devine, 100 F.3d at

80-81; Fountain v. Metcalf, Zima & Co., 925 F.2d 1398, 1399-1401

(11th Cir. 1991). We do not, however, hitch our wagon to cases

deciding  whether a particular individual is an employee as opposed

to an independent contractor. That distinction is between those

who are part of an employer's business and those who are running

their own businesses, and the factors central to that inquiry are

inapposite here. See Wheeler, 825 F.2d at 271-72.

There are also a few cases which deal directly with

whether  a  partner in a professional practice should be regarded as

an  employee  for the purpose of Title VII (and, therefore, entitled

to its safeguards). The seminal case is Burke v. Friedman, 556

F.2d 867, 869-70 (7th Cir. 1977), in which the court held that

partners in an accounting firm were not employees vis-a-vis Title

7

VII. This interpretation received a modicum of support in Hishon

v.  King  &  Spalding, 467 U.S. 69 (1984). Although the Hishon Court

answered  a  different question holding that Title VII precluded a

law  firm  from denying partnership consideration to an associate on

the basis of her gender, see id. at 76-78 Justice Powell

cautioned that the majority opinion did "not require that the

relationship among partners be characterized as an `employment'

relationship to which Title VII would apply." Id. at 79 (Powell,

J., concurring). Since Hishon, several appellate courts have

followed  Justice Powell's lead and declared, with varying nuances,

that partners are not protected as employees under federal

antidiscrimination laws. See Simpson v. Ernst & Young, 100 F.3d

436, 443 (6th Cir. 1996), cert. denied, 117 S. Ct. 1862 (1997);

Wheeler, 825 F.2d at 263; accord EEOC Decision No. 85-4, 2 Empl.

Prac. Guide (CCH) q 6846, at 7040-41 & n.4 (1985).

As we visualize it, the key inquiry is into the

attributes of the relationship between the partnership and those

whom  it  styles  as  partners. The method by which this inquiry is to

be conducted how a court determines whether an individual

labelled  as  a partner is to be treated as an employee for purposes

of Title VII is an unresolved issue which lies at the epicenter

of this appeal.

III. THE LITIGATION

When  her  three  former  partners folded the Firm and dashed

her expectations of proprietary parity, Serapion sued them and

their new firm (Martinez, Odell & Calabria) in Puerto Rico's

8

federal district court. She charged in her complaint that the

defendants had violated both Title VII and local law. After the

defendants'  early  attempt to obtain summary judgment misfired,2 the

parties  engaged in pretrial discovery. Thereafter, the defendants

renewed their quest for brevis disposition. Their new motion

relied on alternative grounds. It averred that Serapion, as a

partner in the Firm, was not an employee (and, therefore, had no

recourse to Title VII). It also averred that Serapion had not

adduced  any  competent  proof that gender-based discrimination caused

the  Firm's  disintegration (an event which the defendants attributed

to irreconcilable differences between two warring factions of

proprietary partners).

Judge Casellas granted the defendants' motion, holding

that Serapion was not an employee as that term had been developed

in federal jurisprudence and that she was thus ineligible for the

prophylaxis of Title VII. See Serapion v. Martinez, 942 F. Supp.

80, 84-85 (D.P.R. 1996). The court held alternatively that

Serapion had failed to make out a prima facie case of

discrimination under Title VII. See id. at 85-87. Finally, the

court refused to exercise supplemental jurisdiction over the

pendent claim and dismissed that claim without prejudice to its

pursuit in the courts of Puerto Rico. See id. at 88-89. This

appeal followed.

2When the defendants filed their initial motion for summary
judgment,  Chief Judge Cerezo denied it. The case was subsequently
transferred  to  Judge  Casellas' calendar as part of a redistribution
of cases ancillary to his assumption of judicial office.

9

IV. THE SUMMARY JUDGMENT STANDARD

While the origins of the summary judgment standard may

have been important in the distant past, modern federal practice

has reached a point at which the standard has achieved aphoristic

acceptance, rendering the attribution of specific authorship

superfluous. We thus present the standard without particularized

citation,  referring  readers interested in further exposition to the

long litany of decisions that have placed a gloss on the language

of Fed. R. Civ. P. 56(c). See McCarthy v. Northwest Airlines,

Inc. ,  56  F.3d  313,  315  (1st Cir. 1995) (collecting cases); Coyne v.

Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995) (same).

Summary judgment is a means of determining whether a

trial is actually required. It is appropriately granted when the

record  shows  that  no  genuine issue of material fact exists and that

the  moving  party  is  entitled to judgment as a matter of law. Thus,

in  order  to  defeat a properly crafted summary judgment motion, the

party opposing it must demonstrate that a trialworthy issue looms

as to a fact which could potentially affect the outcome of the

suit.

A trial or appellate court considering the merits of a

summary judgment initiative must peruse the record in the light

most favorable to the nonmovant. While this equation must take

into account all properly documented facts, the court may ignore

unsupported conclusions, rank speculation, and opprobrious

epithets. If the evidence, so viewed, reveals a genuine dispute

over a material fact that is, if a reasonable factfinder,

10

examining  the  evidence  and drawing all reasonable inferences in the

required manner, could resolve a factual controversy which is

critical  to  the  outcome  of the case in favor of the nonmoving party

then summary judgment will not lie.

Where, as here, the district court enters summary

judgment, we review its ruling de novo.

V. THE DOCTRINAL PARAMETERS

Putting this appeal into proper perspective requires us

to  articulate  the  doctrinal parameters which inform an inquiry into

a partner's status vis-a-vis Title VII. We divide our discussion

into two segments.

A.

Partnerships  are  mutable  structures, and partners come in

varying shapes and sizes. Consequently, attempting to delineate

the  circumstances in which a particular partner should be regarded

as  an  employee  for  Title  VII purposes is tricky business. Although

one court has hinted at the desirability of a per se rule, saying

in effect that all members of professional services corporations

were  employees for purposes of the antidiscrimination laws (there,

the  ADEA),  no  matter  how  significant a role they played in managing

the  affairs  of  the  corporation, see Hyland, 794 F.2d at 797-98,3 we

reject the notion that labels can conclusively resolve status

inquiries. We hold instead that the Title VII question cannot be

3We note that the Second Circuit appears to have retreated
somewhat  from  this  position. See EEOC v. Johnson & Higgins, Inc.,
91  F.3d  1529, 1538-39 (2d Cir. 1996), petition for cert. filed, 65
U.S.L.W. 3755 (U.S. May 1, 1997) (No. 96-1743).

11

decided  solely on the basis that a partnership calls or declines

to call a person a partner. A court must peer beneath the

label and probe the actual circumstances of the person's

relationship  with the partnership. See Devine, 100 F.3d at 80-81;

Fountain ,  925 F.2d at 1400-01; see also Hishon, 467 U.S. at 79 n.2

(Powell,  J.,  concurring)  ("Of course, an employer may not evade the

strictures of Title VII simply by labelling its employees as

`partners.'"); see generally Board of Trade v. Hammond Elevator

Co. ,  198  U.S. 424, 437-38 (1905) (holding that the manner in which

the parties to an agreement designate their relationship is not

controlling). In other words, partnerships cannot exclude

individuals  from  the  protection of Title VII simply by draping them

in grandiose titles which convey little or no substance.

In our judgment, the correct course is to undertake a

case-by-case analysis aimed at determining whether an individual

described  as  a  partner  actually bears a close enough resemblance to

an employee to be afforded the protections of Title VII. See

Strother  v.  S outhern Cal. Permanente Med. Group, 79 F.3d 859, 867-

68 (9th Cir. 1996) (reversing grant of summary judgment where the

trial  court  based its status determination principally on the fact

that  the  plaintiff  was  called a partner); see also Devine, 100 F.3d

at 81 (holding, in a case involving a professional services

corporation,  that a court should not treat either the individual's

title  or  the  entity  form  as determinative). After all, form should

not be permitted to triumph over substance when important civil

rights are at stake.

12

We also reject a variation on the per se theme advanced

by the appellant. She asseverates that, due to the peculiarities

of Puerto Rico's civil law structure, all partners in all Puerto

Rico partnerships must be considered employees for purposes of

Title  VII.   In a civil law system, this theory goes, a partnership

is not merely a banding together of individual partners but a

separate  entity  which  must itself be considered the employer of all

the individual partners.

We need not delve too deeply into the hotly disputed

question  of  whether the appellant's construct is sound as a matter

of Puerto Rico law. It is enough for our purposes that the

construct is unsound as a matter of federal law. The appellant

cites no apposite authority for the novel proposition that the

status of an individual under Title VII should vary depending on

the  law  of  the state in which a partnership entity is chartered or

in which a claim arises. We think that the reverse is true:

whether an individual is an employee for purposes of Title VII is

a matter of federal law, and the question must be answered with

reference  to  principles  of federal law. Accord Broussard, 789 F.2d

at  1159-60;  C obb v. Sun Papers, Inc., 673 F.2d 337, 339 (11th Cir.

1982); Lambertsen v. Utah Dep't of Corrections, 922 F. Supp. 533,

536 (D. Utah 1995), aff'd, 79 F.3d 1024 (10th Cir. 1996).4 This

determination  is  grounded in both Supreme Court case law and strong

federal policies of uniformity and fairness.

    4 The  Bro ussard decision is of particular interest because the
claim which was considered there arose in Louisiana a
jurisdiction which, like Puerto Rico, has a civil law tradition.

13

In  Robinson  v Shell Oil Co., 117 S. Ct. 843 (1997), the

Court decided that the word "employee," as used in the

antiretaliation section of Title VII, 42 U.S.C. S 2000e-3(a),

included  former as well as current employees. See id. at 849. In

this issue, the Court ignored state law, concentratin .  resolving g

instead on the statute itself and on federal jurisprudence. See

id. at 846-48. The Court took a similar approach in Walters v.

Metropolitan Educ. Enters., Inc., 117 S. Ct. 660, 663-66 (1997),

resolving the scope of the words "employee" and "employer" under

Title VII by reference solely to federal statutes and judicial

opinions.   So, too, in Darden, 503 U.S. at 322-23 & n.3, the Court

determined the meaning of "employee" under ERISA through the

application of established common law principles (rejecting the

idea that the term incorporated the law of any particular state).

These cases are merely specific applications of the

widely  accepted principle that, in the absence of plain indication

of a contrary intent, courts ought to presume that the

interpretation of a federal statute is not dependent upon state

law. 5   See ,  e.g. ,  Mississ ippi Band of Choctaw Indians v. Holyfield,

490 U.S. 30, 43 (1989); Dickerson v. New Banner Inst., Inc., 460

U.S.  103,  119  (1983);  Uni ted States v. De Luca, 17 F.3d 6, 8-9 (1st

Cir. 1994).

    5 We  are  unimpressed by the appellant's attempted analogy to a
line of cases involving the federal tax laws. See, e.g., Morgan
v.  Commission er, 309 U.S. 78 (1940). The appellant has not called
to our attention any court which has accepted those cases as
persuasive in the Title VII context, and we decline to be the
first.

14

Our  refusal  to give state law controlling weight on this

question  not  only comports with the case law but also makes common

sense. Linking status determinations to local law would make an

important federal statute mean different things in different

states. This sort of checkerboarding would undermine Congress'

easily  discerned intent that Title VII stand as a national code of

conduct in the struggle to ensure equality of treatment in the

workplace. See 110 Cong. Rec. 13,088-13,091 (1964). Moreover,

since  the  United  States  is home to in excess of 1,000,000 operating

partnerships, numbering over 13,000,000 individual partners, see

U.S. Bureau of the Census, Statistical Abstract of the United

States 535 (116th ed. 1996), relegating status determinations to

local law would create enormous confusion and widespread

uncertainty.

In regard to Title VII, there is no basis for departing

from the precept that "federal statutes are generally intended to

have  uniform  nationwide application," Mississippi Band of Choctaw

Indians ,  490  U.S. at 43, and there is every reason for adhering to

it. Here, moreover, the possibility that defining the term

"employee"  by reference to local law would open the door for state

legislatures to adopt restrictive definitions and thereby defeat

Title  VII's  broad remedial purposes militates strongly in favor of

a uniform national standard. Cf. United States v. Kimbell Foods,

Inc. ,  440  U.S. 715, 728 (1979) (suggesting that, in cases in which

the application of state law would frustrate the specific

objectives  of  a  federal  program, establishing uniform federal rules

15

is appropriate). Thus, we hold that the meaning of the term

"employee," as that term is used in Title VII, must be derived

through an analysis of federal statutes, legislative history,

judicial  decisions, and common law understandings, not through the

law of Puerto Rico.

B.

Having  determined that federal law controls the question

of the appellant's status, we turn next to an analysis of those

attributes  of  a  partner's relationship to the partnership which may

influence the decisional calculus. In this endeavor, we do not

write on a pristine page. Two other courts of appeals have tried

their  hands  at plotting the line which divides partners who may be

treated  as  employees  under federal antidiscrimination statutes from

those who may not.

In Simpson, the Sixth Circuit considered the status for

ADEA purposes of an individual denominated a partner by an

international accounting firm. In attempting to ascertain whether

the plaintiff, notwithstanding his title, qualified as a person

protected by the ADEA, the court weighed factors such as:

the right and duty to participate in
management; the right and duty to act as an
agent of other partners; exposure to
liability; the fiduciary relationship among
partners . . . participation in profits and
losses; investment in the firm; partial
ownership of firm assets; voting rights; the
aggrieved individual's ability to control and
operate the business; the extent to which the
aggrieved individual's compensation was
calculated as a percentage of the firm's
profits; the extent of that individual's
employment  security; and other similar indicia
of ownership.

16

Simpson, 100 F.3d at 443-44. Concluding that the plaintiff more

closely resembled an employee than a proprietor the court noted

particularly  that the plaintiff had no right either to participate

in  the  partnership's management decisions or to vote for those who

did, and that his compensation was not determined on the basis of

the firm's profits the court allowed the plaintiff to sue under

the ADEA. See id. at 441-43.

The Tenth Circuit grappled with the same sort of

conundrum in Wheeler, a case which also involved a partner in an

accounting firm. In determining that the plaintiff was not an

employee  for  purposes of either Title VII or the ADEA, the Wheeler

court  focused on her participation in firm profits and losses, her

exposure to liability, her investment in the firm, and her voting

rights under the partnership agreement. See Wheeler, 825 F.2d at

276.

Other cases, though not involving partnerships, are

useful in our analysis. In Devine, for example, the Eighth

Circuit, in deciding whether attorneys who were shareholders and

directors  in  a  professional services corporation were employees for

Title VII purposes, stated that courts should "look to the extent

to  which  [the  attorneys]  manage and own the business." Devine, 100

F.3d at 81. The court proceeded to consider factors such as the

attorneys' ability to participate in setting firm policy, the

extent  of  their contributions to firm capital, their liability for

firm debts, and the correlation (or lack of correlation) between

their compensation and the firm's profits. See id.

17

In  a  comparable  situation, the Eleventh Circuit evaluated

the ADEA claim of a member-shareholder of an accounting firm by

weighing  elements such as the plaintiff's ability to share in firm

profits and whether his compensation was a function of those

profits; the plaintiff's liability for the firm's losses, debts,

and  obligations;  and  the  extent of the plaintiff's right to vote on

major firm decisions. See Fountain, 925 F.2d at 1401. The court

dismissed  an  assertion that the "autocratic" actions of the firm's

president constituted a reasonable basis for concluding that the

plaintiff  was an employee. "Domination by an `autocratic' partner

over  others  is  not  uncommon and does not support a finding that the

others are `employees.'" Id.

We think that these cases provide valuable guidance

concerning  the factors which courts must consider in making status

determination s under Title VII. In large, the critical attributes

of  proprietary status involve three broad, overlapping categories:

ownership,  remuneration, and management. Within these categories,

emphasis will vary depending on the circumstances of particular

cases. Nonetheless, although myriad factors may influence a

court's ultimate decision in a given case, we recount a non-

exclusive list of factors that frequently will bear upon such

determinations.

Under the first category, relevant factors include

investment  in  the  firm,  ownership of firm assets, and liability for

firm debts and obligations. To the extent that these factors

exist,  they  indicate  a  proprietary role; to the extent that they do

18

not  exist,  they  indicate  a status more akin to that of an employee.

Under the second category, the most relevant factor is

whether (and if so, to what extent) the individual's compensation

is based on the firm's profits. To the extent that a partner's

remuneration is subject to the vagaries of the firm's economic

fortunes, her status more closely resembles that of a proprietor;

conversely, to the extent that a partner is paid on a straight

salary  basis,  the  argument for treating her as an ordinary employee

will gain strength. A second potentially relevant factor in this

regard relates to fringe benefits. An individual who receives

benefits of a kind or in an amount markedly more generous than

similarly situated employees who possess no ownership interest is

more likely to be a proprietor.

Under the third category, relevant factors include the

right  to  engage  in  policymaking; participation in, and voting power

with  regard  to, firm governance; the ability to assign work and to

direct  the  activities  of  employees within the firm; and the ability

to  act  for  the firm and its principals. Once again, to the extent

that these factors exist, they indicate a proprietary role.

We add a note of caution. Status determinations are

necessarily made along a continuum. The cases that lie at the

polar extremes will prove easy to resolve. The close cases,

however, will require a concerned court to make a case-specific

assessment of whether a particular situation is nearer to one end

of the continuum or the other. In performing this assessment, no

single  factor should be accorded talismanic significance. Rather,

19

a status determination under Title VII must be founded on the

Given  these  verities, any effort to formulate a hard-and-fast rule

would likely result in a statement that was overly simplistic, or

too general to be of any real help, or both. 

VI. THE MERITS

To complete our journey, we must undertake a

particularized totality of the circumstances which pertain in a particular case. analysis aimed at determining whether the lower

court,  at  the summary judgment stage, appropriately could conclude

that  Serapion  was  not  an  employee of the Firm within the purview of

Title  VII.   Consistent  with the summary judgment protocol, we focus

only on uncontested documentary proof, such as the provisions of

the partnership agreement and the minutes of the Firm's Executive

Committee meetings (every page of which bears the appellant's

initials), supplemented by facts asserted by the appellant and

those conceded by her.

The factors relevant to ownership and remuneration

provide powerful indications that the appellant should not be

treated as an employee for Title VII purposes. It is undisputed

that Serapion received an equity interest in the Firm upon being

named a proprietary partner. Her compensation was predicated in

substantial  measure  on  the Firm's profits,6 and she would have been

6Whereas associates in the Firm received fixed compensation
(plus an occasional bonus based on performance), all partners
(senior  and  junior) received a base salary supplemented by a share
of the Firm's profits paid out periodically in proportion to each
partner's  allotment  of  PDUs. For example, when the appellant first
ascended to proprietary partnership, her overall compensation was
composed of a base salary ($60,183 per annum) plus a share of the

20

liable had the Firm sustained losses. In the ensuing months, she

made substantial capital contributions to the Firm. She als

received very generous fringe benefits, e.g., a car allowance in

excess of $10,000 per annum and a discretionary expense allowance

of $16,400 yearly. These benefits were comparable to those

received by the other proprietary partners, but more extravagant

than the benefits available to junior partners and associates.

The picture is only slightly less clear as to the

e o management prong of the test. As a proprietary partner, th

appellant participated meaningfully in the Firm's governance.

Unlike non-proprietary partners (who were allowed to attend Board

of Partners' meetings but could vote only on matters affecting

their own interests), proprietary partners were guaranteed a vote

in  all  matters  brought  before the Board. The partnership agreement

describes  this tribunal as "the highest policy and decision making

body of the Firm." Furthermore, the appellant's vote had added

significance: if an impasse developed between a majority of the

Board and 4/5ths of the proprietary partners, the decision of the

proprietary partners controlled. While the appellant belittles

Board membership, voting status in a law firm's highest

decisionmaking body is no small thing. The fact that the

firm's  profits  (amounting to approximately $30,000 during her first
year  as  a  proprietary partner). Her total compensation was pegged
to  75%  of  what the four name partners received (resulting in gross
remuneration appreciably higher than that earned by any non-
proprietary  partner).   Her percentage allocation increased steadily
during the period that followed, so that, at the time the Firm
dissolved  in  1992,  her  total compensation equalled 92% of the total
compensation paid to each of the name partners.

21

membership consisted of roughly half the lawyers in the Firm

dilutes,  but  does  not  dispel, the significance of such membership.7

Serapion's involvement in management went well beyond

membership in the Board of Partners. She served as one of five

voting  members  of  the  Executive Committee, which managed the Firm's

day-to-day operations and regularly decided matters relating to

salaries, finances, fee schedules, office space, employee

performance,  recruitment, admission of new partners, acceptance of

business,  work  assignments, and the staffing of cases. In a period

of  about  two  years,  the  appellant attended no fewer than sixteen of

these meetings and wrote up the minutes. A review of Serapion's

handiwork  shows her to have been a robust participant in important

policy decisions; for example, the minutes reflect that she made

several  motions  anent  the admission of new partners. The Executive

Committee was the nerve center of the Firm. The appellant's

membership on it, coupled with her degree of involvement in

management generally, strongly suggests that she was not an

employee.   So, too, does the fact that she had authority to act as

an agent for the Firm and its partners; one manifestation of this

authority was that, after she became a senior partner, the Firm

empowered her to sign checks drawn on its accounts.

The appellant does not go gently into this dark night.

For  the  most  part,  she  strives to refocus our attention on the ways

    7 We  take judicial notice of the fact that many law firms have
partner/associate ratios near one-to-one, yet few lawyers working
for these firms would deny that the partners enjoy a status
fundamentally different from that of the associates.

22

in  which  she  possessed  less power than the four name partners. She

complains that her name was never added to the Firm's name; that

neither  her  compensation  nor her equity interest ever equalled that

of  the  name  partners;  that she had less authority to assign matters

within the Firm; and that she did not head any of the Firm's

departments.   But  this  constellation of complaints assumes that all

partners except those equivalent in stature and authority to the

most powerful partners of a law firm are employees for Title VII

purposes. The assumption lacks any solid legal underpinning. A

person with the requisite attributes of proprietary status is

properly considered a proprietor, not an employee, regardless of

the fact that others in the firm may wield more power. See

Fountain, 925 F.2d at 1401.

The appellant also makes a closely related argument,

noting  that  she  rarely  got her way on disputed matters and that she

dissented  from many decisions.8 But focusing on the fact that her

views sometimes did not prevail confuses participation with

control.   Insofar  as  the  management prong of the test is concerned,

the  hallmarks  of  proprietary status are the right to participate in

decisionmaking and the right to have a meaningful say in

governance. Within the structure of any organization, certain

8It is disingenuous for the appellant to focus on the number
of  recorded  votes taken by the Executive Committee as proof of her
alleged powerlessness, especially since the minutes of those
meetings indicate that the vast majority of policy decisions were
reached by consensus. General agreement on a matter is certainly
tantamount to a vote, and it cannot be gainsaid that numerous
policy  decisions were made, often by unanimous consent, during the
time the appellant was a member of the Executive Committee.

23

individuals  tend  to  dominate others, and the dominators' viewpoints

will  more  often be adopted. See id. This phenomenon often occurs

among equals (Adams reportedly wrote to Jefferson on November 12,

1813,  describing Dickinson as "primus inter pares, the bellwether,

the leader of the aristocratical flock") and, in all events, the

exercise  of  hegemony  by  one partner does not automatically dislodge

others  in  the  hierarchy  from proprietary status. Elsewise, all the

partners in a law firm or an accounting practice, save only the

managing partner(s), would be treated as employees for Title VII

purposes regardless of the extent of their ownership or the

correlation between their remuneration and the entity's profits.

The law is to the contrary: it is not a necessary corollary of

proprietary status that the views of the partner in question will

always or even usually prevail.

In this case, all roads lead to Rome. The evidence is

uncontradicte d that the appellant had an ownership interest in the

Firm; that her compensation depended substantially on the Firm's

fortunes; and that she enjoyed significant voting rights in the

Firm's two principal governing bodies. Given these undisputed

facts, no reasonable factfinder could conclude that Margarita

Serapion was other than a bona fide equity partner, and, as such,

a person ineligible to claim the protection which Title VII

reserves for those who are employees. Consequently, the district

court did not err in granting summary judgment in the defendants'

24

favor on the Title VII claim.9

VII. THE IDENTITY OF THE DEFENDANTS

Before closing, we note a procedural anomaly. For

reasons best known to her, the appellant elected to sue three of

her former partners and their fledgling partnership, but not the

Firm. This tactic raises questions about whether the new

partnership can be held liable as a successor to the Firm and

whether  law  partners  can  be held individually liable as "employers"

under  Title  VII. The last question, in particular, is potentially

difficult. Compare Tomka v. Seiler Corp., 66 F.3d 1295, 1314-17

(2d  Cir.  1995) (dismissing the possibility of individual liability

under Title VII) with Kauffman v. Allied Signal, Inc., 970 F.2d

178, 184-85 (6th Cir. 1992) (suggesting that individual liability

exists). This circuit has not resolved the issue. See Scarfo v.

Cabletron  Sys., Inc., 54 F.3d 931, 951-52 (1st Cir. 1995) (leaving

the question open).

We need not enter this thicket today. It is crystal

clear  that  the liability (if any) of the individual defendants and

the new partnership cannot possibly exceed that of the actual

employer. Because Serapion was not an employee, her suit cannot

proceed  under  Title  VII  against any of the individual defendants or

against the new partnership.

9Because this ground is dispositive of the federal claim, we
take no view of the district court's alternative holding that
Serapion failed to make out a prima facie case of gender-based
discrimination.

25

VIII. CONCLUSION

We need go no further. Once it had determined that the

federal claim could not go forward, the district court had

substantial discretion under 28 U.S.C. S 1367(c)(3) (1994) either

to  retain  or  to  relinquish jurisdiction over the supplemental claim

which the appellant had brought under local law. See, e.g.,

McIntosh  v.  Antonino ,  71  F.3d 29, 33 n.3 (1st Cir. 1995); Rodriguez

v.  Doral  Mortgage  Corp.,  57 F.3d 1168, 1176-77 (1st Cir. 1995). In

this instance, the court's decision to refrain from exercising

jurisdiction was well within the encincture of its discretion.

Affirmed.

26